# Supreme Court of Florida

_____

No. SC12-1762
_____

**ARTHUR JAMES MARTIN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[September 24, 2014]

PER CURIAM.

This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Arthur James Martin (Martin) was convicted in Duval County of first-degree murder in the 2009 death of Javon Daniels (Daniels). For the reasons expressed in this opinion, we affirm Martin's conviction and his sentence of death. We begin by setting forth the facts of this case and then discuss the issues that Martin raises in this direct appeal. We conclude by addressing both the sufficiency of the evidence on which the jury relied to convict Martin and the proportionality of Martin's sentence of death.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

Two days before the murder, Martin's friend and codefendant Franklin Batie (Batie) was involved in a shooting where he was grazed on the back of the head and neck. On October 28, 2009, the day of the murder, Batie drove Martin to the Weber 5B Apartments in Jacksonville so that Martin could visit someone. Batie drove his car, a white Ford, to the apartment complex, and he remained in the car while Martin got out of the car and engaged in conversation. In the back seat of the Ford was Batie's loaded .45 caliber handgun. The gun was equipped with a thirty-round magazine.

While Batie remained in the car and waited for Martin, he noticed a white sport utility vehicle (SUV) and thought that he recognized the driver of the SUV as the person who shot him days earlier. Batie retrieved his gun from the backseat and mentioned to Martin that he possibly recognized the driver as having tried to shoot him. Martin then took Batie's gun and went to the driver's side of the SUV and began firing multiple shots at the driver, nineteen-year-old Daniels. When Daniels tried to escape through the passenger side of the SUV, Martin walked around the front of the SUV to the passenger side and continued firing. Eyewitness Sebastian Lucas testified that upon reaching the passenger side, Martin "shot him [Daniels] back down in the car." When Martin finished shooting, he walked back to the Ford, and Batie drove Martin home. Daniels died at the scene.

Batie drove home to Starke, Florida, where he disposed of his Ford and began driving another vehicle. The murder weapon was never located.

Following the murder, detectives interviewed multiple eyewitnesses who viewed photo spreads of possible suspects and identified Martin as the shooter. Some of the witnesses did not know Martin by his given name but by his nicknames, "Beer Belly" or "Shorty Fat." Martin was arrested several days after the murder, and a grand jury later indicted him for first-degree murder. Three days after Martin's arrest, Batie was arrested in Starke. Batie later entered a guilty plea to second-degree murder. After the conclusion of Martin's trial, Batie was sentenced to ten years' imprisonment for his role in the murder.

Martin's case proceeded to a jury trial in 2012. The presentation of evidence during the guilt phase occurred solely during the State's case-in-chief. The State presented eyewitness testimony in addition to testimony from the medical examiner and law enforcement officers. Multiple eyewitnesses, including codefendant Batie, testified and identified Martin as the person who shot Daniels. One of the eyewitnesses, Tasheana Hart, testified that in the days following the murder, Martin asked her "not to tell" what she saw on the day of the murder and offered her money in exchange for her silence.

The medical examiner, Dr. Valerie Rao, testified that Daniels sustained a total of twelve gunshot wounds. Daniels was shot in his left hand, left arm, right

arm, left side, right side, right thigh, and chest. Four of the gunshot wounds produced fatal injuries to Daniels' lungs, heart, liver, and stomach. Daniels endured significant internal and external bleeding, and a total of 700 cubic centimeters of blood was collected from his chest cavity. The gunshot wounds to each of Daniels' arms broke the humerus in each arm, and the gunshot wound to his left hand broke two of the bones in his hand. These broken bones incapacitated Daniels and left him incapable of completing his attempted escape from the SUV.

At the conclusion of the State's case-in-chief, the defense rested without presenting evidence. After the jury deliberated and returned with a guilty verdict, the case proceeded to the penalty phase. During the penalty phase, in its initial case, the State presented two victim impact witnesses. The defense also stipulated to Martin's conviction for second-degree murder.

In its penalty phase case, the defense presented the testimony of three witnesses: Martin's mother, sister, and court-appointed mental health expert. Martin's mother and sister testified about Martin's personal life, including his childhood, family relationships, overall demeanor, work ethic, and health.

Martin's mental health expert was Dr. Stephen Bloomfield, a psychologist. Dr. Bloomfield testified that he reviewed background records, visited with Martin in jail, and administered psychological testing. Dr. Bloomfield also interviewed multiple witnesses, including Martin's mother and sister. Although Dr. Bloomfield

- 4 -

testified that he reviewed thousands of pages of records, he was unable to conduct an exhaustive review of Martin's Miami-Dade Public Schools records because the majority of the records were destroyed by the school district as a matter of course when Martin reached twenty-five years of age.

In order to evaluate Martin's IQ, in 2011, Dr. Bloomfield administered the Wechsler Adult Intelligence Scale, fourth edition, or the WAIS-IV. He also tried to administer the Wide Range Achievement Test 4 (WRAT-4), but Martin was unable to complete the test. Dr. Bloomfield testified that Martin's WAIS-IV full-scale IQ score of 54 placed him in the mildly mentally retarded range. However, Dr. Bloomfield was unable to diagnose Martin as mentally retarded because he was unable to determine the onset of mental retardation prior to age 18 nor Martin's adaptive functioning prior to age 18.[1]

Dr. Bloomfield testified that Martin's Florida Department of Corrections (DOC) records revealed multiple mental health evaluations and IQ screening tests. According to those records, although Martin never showed signs of significant mental or emotional deficits and never demonstrated that he was incapable of living in the general population, he was deemed "low functioning." DOC records

---

1. Effective July 1, 2013, the term "mentally retarded" has been replaced with the term "intellectually disabled," and the term "mental retardation" has been replaced with the term "intellectual disability." See § 921.137, Fla. Stat. (2013).

documented that between 1992 and 2008, Martin took four IQ screening tests, with scores ranging from a low of 58 in 2002 to a high of 94 in 2008.[2]

Dr. Bloomfield concluded that Martin has low cognitive functioning, is functionally illiterate, and suffers from a learning disability because of his inability to read. Dr. Bloomfield observed that Martin's grades in school were mixed and that Martin had numerous absences and caused frequent disruptions. However, Dr. Bloomfield conceded that Martin's grades were not necessarily due to a lack of intellectual capability but due to his disruptive behavior and absences from school.

In rebuttal, the State offered the testimony of Miami-Dade Police Department Detective Chris Stroze. Detective Stroze was involved in a 1998 murder investigation that led to Martin's conviction for second-degree murder. Detective Stroze testified that Martin did not have any problems reading or understanding the waiver form that advised him of his constitutional rights.

At the conclusion of the penalty phase, by a nine-to-three vote, the jury recommended that Martin be sentenced to death. A <u>Spencer</u>[3] hearing followed, where both parties offered additional argument but did not present additional

---

2. In 1992, Martin scored a 71 on the WAIS-R. In 2002, he scored a 58 on the Beta-2-R. In 2008, he scored a 64 on the Beta 3 and a 94 on the WAIS-I. Dr. Bloomfield observed that the WAIS-IV that he administered to Martin was Martin's only full-scale IQ test.

3. <u>Spencer v. State</u>, 615 So. 2d 688 (Fla. 1993).

evidence. At the sentencing hearing, the trial court sentenced Martin to death, having found that sufficient aggravating circumstances existed to warrant the death penalty and that the aggravating circumstances outweighed any mitigating circumstances. The trial court found three aggravating circumstances and assigned each one great weight: (1) prior violent felony; (2) the murder was especially heinous, atrocious, or cruel (HAC); and (3) the murder was cold, calculated, and premeditated (CCP). The trial court also found one statutory mitigating circumstance: Martin's age at the time of the murder (40 years of age), to which it assigned slight weight based on minimal evidence of Martin's significant emotional immaturity. Additionally, the trial court evaluated fourteen nonstatutory mitigating circumstances proposed by the defense,[4] and it found two other mitigating circumstances that were not proposed by the defense but were supported

_____

4. The trial court findings as to the nonstatutory mitigating circumstances proposed by Martin are as follows: (1) Martin is functionally illiterate (slight weight); (2) Martin has a learning disability (slight weight); (3) Martin has low cognitive functioning (some weight); (4) Martin suffered a lifetime of poor health, including asthma, diabetes, and sleep apnea (slight weight); (5) Martin was a loving and caring son (slight weight); (6) Martin was a hard worker (slight weight); (7) Martin was generous (slight weight); (8) Martin was reverent (slight weight); (9) Martin was a loving and caring brother (slight weight); (10) Martin's love of work was often thwarted by his poor physical health (very slight weight); (11) Martin's childhood was plagued by the excessive alcohol consumption and fighting of his parents (some weight); (12) Martin was respectful to the judge and other officers of the court (very slight weight); (13) sentencing Martin to death is disproportionate and disparate given Batie's sentence to life imprisonment (rejected as not proven); and (14) the jury recommendation was not unanimous (proven, but no weight assigned).

by the record.[5]  The trial court concluded in part: "Despite the existence of mitigating factors and the weight assigned to each by this Court, the nature and quality of those factors pales in comparison to the enormity of the aggravating circumstances in this case."  In this direct appeal, Martin raises four issues that attack the validity of his death sentence.

## ISSUES ON APPEAL

Martin raises the following issues in this appeal: (1) whether the trial court made improper findings of fact and gave insufficient consideration in mitigation to Martin's intellectual functioning; (2) whether the trial court failed to consider, find, and weigh as a mitigating circumstance that Martin had a history of drug and alcohol abuse; (3) whether the trial court erred in finding that the homicide was committed in a cold, calculated, and premeditated manner and was especially heinous, atrocious, or cruel; and (4) whether Florida's death penalty scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002), and therefore unconstitutionally imposed.  We address each of these issues in turn.  We then discuss, as in every direct appeal, the sufficiency of the evidence and the

---

5. The trial court found the following nonstatutory mitigating circumstances that were not proposed by the defense: (1) Martin had temper issues (slight weight); and (2) when Martin was a child, he was attacked by other children (slight weight).

proportionality of Martin's sentence of death. As we discuss below, we affirm

Martin's conviction and his sentence of death.

## Mental Health Mitigation

Martin contends that the trial court made erroneous findings of fact with

respect to his IQ score and that as a result, the court did not properly weigh his low

cognitive functioning as a mitigating circumstance. Martin also maintains that

despite the fact that Dr. Bloomfield was unable to diagnose him as mentally

retarded, his IQ score of 54, standing alone, is entitled to additional weight.

In every case, when determining the appropriateness of a sentence of death,

"trial courts are required to consider all mitigating evidence presented by the

defendant and supported by the record." Griffin v. State, 820 So. 2d 906, 913

(Fla. 2002) (citing Walker v. State, 707 So. 2d 300, 318 (Fla. 1997)). We have

explained:

> When addressing mitigating circumstances, the sentencing
> court must expressly evaluate in its written order each mitigating
> circumstance proposed by the defendant to determine whether it is
> supported by the evidence and whether, in the case of nonstatutory
> factors, it is truly of a mitigating nature.

Campbell v. State, 571 So. 2d 415, 419 (Fla. 1990) (citations and footnotes

omitted). Moreover, a "trial court must find as a mitigating circumstance each

proposed factor that has been established by the greater weight of the evidence and

that is truly mitigating in nature." Coday v. State, 946 So. 2d 988, 1003 (Fla.

- 9 -

2006). "The weight assigned to a mitigating circumstance is within the trial court's discretion" and is reviewed for an abuse of discretion. Harris v. State, 843 So. 2d 856, 868 (Fla. 2003) (citing Rogers v. State, 783 So. 2d 980 (Fla. 2001)). This Court will uphold each of the trial court's findings that are supported by competent, substantial evidence in the record. See Lebron v. State, 982 So. 2d 649, 660 (Fla. 2008).

Competent, substantial evidence supports the trial court's finding of Martin's low cognitive functioning as a nonstatutory mitigating circumstance. However, Martin argues that the trial court made improper factual findings regarding his IQ and consequently failed to assign his low cognitive functioning the weight to which it was entitled. He contends that footnote six in the trial court's sentencing order reflects the court's improper findings and supports his argument. The footnote reads:

> 6. Dr. Bloomfield found that the Defendant was competent to stand trial, and could not diagnose the Defendant as mentally retarded. Dr. Bloomfield administered the WAIS-R to the Defendant, and he registered with an IQ of 71. However, Dr. Bloomfield's research revealed that one of the Defendant's prior IQ tests resulted in [a] score of 94.

The trial court did incorrectly state that Dr. Bloomfield administered the WAIS-R. Dr. Bloomfield administered only the WAIS-IV in 2011. However, Martin did score a 71 on the WAIS-R as administered in 1992; the test simply was not administered by Dr. Bloomfield. Thus, the trial court's misstatement constitutes

- 10 -

harmless error.  See Merck v. State, 975 So. 2d 1054, 1066 n.5 (Fla. 2007)

("Factual errors in a sentencing order are subject to harmless error analysis.");

Griffin, 820 So. 2d at 914 (concluding that "a full reading of the trial court's order

reveals" a thorough consideration of the nonstatutory mitigating circumstance

proposed by the defendant).

The weight assigned by the trial court to Martin's low cognitive functioning

does not reflect an abuse of the court's discretion.  In sum, the trial court evaluated

a total of sixteen nonstatutory mitigating circumstances.  Only two of them,

Martin's low cognitive functioning and the impact of his parents' behavior on his

childhood, were assigned some weight.  Most of the nonstatutory mitigating

circumstances were assigned slight weight, and the remainder were assigned very

slight weight, no weight, or rejected as not proven.  These assignments of weight

demonstrate that the trial court recognized the significance of Martin's low

cognitive functioning.  The trial court did not abuse its discretion in affording some

weight to this nonstatutory mitigating circumstance.  See Merck, 975 So. 2d at

1065-66 (concluding that Merck's challenge to the weight assigned to established

nonstatutory mitigating circumstances was not "unreasonable or arbitrary given the

entirety of the evidence presented.").

Martin further contends that his IQ score of 54 is itself entitled to additional

weight and argues that "evidence supporting a defendant's mental retardation, even

- 11 -

if such evidence does not meet the statutory legal requirement for mental retardation, is entitled to be recognized as carrying additional significance and weight." Martin contends that just as a defendant's age may be a bar to execution, his IQ score, as evidence of mental retardation, should serve a similar function. Given the evidence presented, the trial court properly considered Martin's IQ score of 54 in conjunction with evidence of his low cognitive functioning. Consequently, Martin is not entitled to relief.

### History of Drug and Alcohol Abuse as Mitigation

Martin also argues that the trial court failed to consider, find, and weigh as a mitigating circumstance that he had a history of drug and alcohol abuse. Prior to sentencing, Martin proposed a list of fourteen nonstatutory mitigating circumstances. However, the list did not include Martin's history of substance abuse. The State argues that Martin was obligated to present his history of substance abuse to the court for consideration as a nonstatutory mitigating circumstance. The State is correct, and Martin is not entitled to relief on this claim.

Although the trial court did evaluate two nonstatutory mitigating circumstances that Martin did not propose, this Court has stated that a defendant "must raise a proposed nonstatutory mitigating circumstance before the trial court in order to challenge on appeal the trial court's decision about that nonstatutory

mitigating factor." Davis v. State, 2 So. 3d 952, 962 (Fla. 2008) (citing Lucas v.

State, 568 So. 2d 18, 23-24 (Fla. 1990)). We have explained that:

> Because nonstatutory mitigating evidence is so individualized, the defense must share the burden and identify for the court the specific nonstatutory mitigating circumstances it is attempting to establish. This is not too much to ask if the court is to perform the meaningful analysis required in considering all the applicable aggravating and mitigating circumstances.

Lucas, 568 So. 2d at 24. Because this burden applies to Martin, and he failed to

propose his history of drug and alcohol abuse as a nonstatutory mitigating

circumstance, he is not entitled to relief.

### Trial Court's Findings of HAC and CCP

Additionally, Martin contends that the trial court erred in finding as

aggravating circumstances that the homicide was committed in a cold, calculated,

and premeditated manner (CCP) and was especially heinous, atrocious, or cruel

(HAC). This Court has previously explained the standard of review that applies to

the review of a trial court's finding of aggravating circumstances:

> When reviewing a trial court's finding of an aggravator, "it is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt—that is the trial court's job." Aguirre-Jarquin v. State, 9 So. 3d 593, 608 (Fla. 2009) (quoting Willacy v. State, 696 So. 2d 693, 695 (Fla. 1997)), cert. denied, [559 U.S. 942], 130 S. Ct. 1505, 176 L. Ed. 2d 118 (2010). Rather, it is this Court's task on appeal "to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding." Id. (quoting Willacy, 696 So. 2d at 695).

- 13 -

<u>Williams v. State</u>, 37 So. 3d 187, 195 (Fla. 2010).  We reject both Martin's claim

that the murder of Daniels was not heinous, atrocious, or cruel and his claim that

the murder was not cold, calculated, and premeditated; thus, we affirm the trial

court's finding of these aggravating circumstances.  We now discuss HAC and

CCP in turn.

HAC

Martin argues that the murder of Daniels, which was the result of multiple

gunshots, did not rise to the level required of a finding that a murder is especially

heinous, atrocious, or cruel.  This Court has explained the HAC aggravating

circumstance as follows:

> It is our interpretation that heinous means extremely wicked or
> shockingly evil; that atrocious means outrageously wicked and vile;
> and, that cruel means designed to inflict a high degree of pain with
> utter indifference to, or even enjoyment of, the suffering of others.
> What is intended to be included are those capital crimes where the
> actual commission of the capital felony was accompanied by such
> additional acts as to set the crime apart from the norm of capital
> felonies—the conscienceless or pitiless crime which is unnecessarily
> torturous to the victim.

<u>State v. Dixon</u>, 283 So. 2d 1, 9 (Fla. 1973) (<u>superseded by statute on other grounds</u>

<u>as stated in</u> <u>State v. Dene</u>, 533 So. 2d 265, 267 (Fla. 1988)).  With regard to

shooting deaths in particular, this Court has stated that "murder by shooting, when

it is ordinary in the sense that it is not set apart from the norm of premeditated

- 14 -

murders, is as a matter of law not heinous, atrocious, or cruel." Lewis v. State, 398 So. 2d 432, 438 (Fla. 1981).

However, "means and manner in which the death is inflicted upon the victim and the victim's perceptions of the surrounding circumstances" may warrant a finding of HAC. McGirth v. State, 48 So. 3d 777, 794 (Fla. 2010). In determining whether a murder is especially heinous, atrocious, or cruel, "the victim's mental state may be evaluated . . . in accordance with a common-sense inference from the circumstances." Swafford v. State, 533 So. 2d 270, 277 (Fla. 1988). "[F]ear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel." Heyne v. State, 88 So. 3d 113, 122 (Fla.) (quoting Lynch v. State, 841 So. 2d 362, 369 (Fla. 2003)), cert. denied, 133 S. Ct. 574 (2012). Moreover, "this Court has 'affirmed findings of HAC where defensive wounds revealed awareness of impending death.' " Williams, 37 So. 3d at 200 (quoting Guardado v. State, 965 So. 2d 108, 116 (Fla. 2007)).

In this case, the trial court explained its finding of HAC as follows:

> The evidence showed that the Defendant approached the vehicle Javon Daniels was in and began shooting into the driver's side. Seven shots were fired at point-blank range. Mr. Daniels attempted to escape the vehicle and the onslaught of bullets by crawling over the passenger seat and out the door. However, the Defendant walked around [the] vehicle, firing one shot into the windshield, and then several more into the passenger's side, tracking the victim as he tried to escape the hailstorm of bullets and shooting

- 15 -

him "back down into the car." The victim had defensive wounds to his hand and both arms, as his left hand bones and both his humeri were broken by bullets. Mr. Daniels died in the vehicle, with his foot wedged against the gear shift lever, and his body face down across the passenger seat, leaning against the passenger door.

The trial court discussed the multiple gunshot injuries sustained by Daniels, and it noted Dr. Rao's testimony that Daniels' death would not have been instantaneous and would have been painful. The trial court also noted that Daniels sustained a defensive wound, suffered substantial internal bleeding, and was awake and alert when he was shot. The trial court then concluded:

> This Court is cognizant that gunshot deaths are usually instantaneous and do not typically qualify as being heinous, atrocious, or cruel, unless accompanied by acts of mental or physical torture to the victim. Diaz v. State, 860 So. 2d 960, 966 (Fla. 2003). However, the evidence established that Mr. Daniels' death was not easy and instantaneous, but instead Mr. Daniels suffered through an agonizing, slow, and painful death. According to Dr. Rao, the death would have been a slow process of internal bleeding due to the fatal shots to the heart, lungs, and liver. Mr. Daniels endured the assailment of bullets to his back, and attempted to escape through the passenger side of the vehicle. However, Mr. Daniels' attempt to escape was to no avail, as the Defendant tracked him around the vehicle and continued his attack. Mr. Daniels tried to shield himself from the bullets and sustained defensive wounds, as evidenced by his fractured humeri and hand. Certainly, Mr. Daniels was acutely aware of his impending death, and the Defendant, never ceasing in his attack while Mr. Daniels attempted to escape, was utterly indifferent to his fear and suffering. Based on the totality of the evidence, this Court finds that this aggravating circumstance was proven beyond a reasonable doubt. This aggravating circumstance has been given great weight in determining the appropriate sentence to be imposed.

As observed by the trial court and observed by both parties, cases involving gunshot deaths do not usually satisfy the requirements of HAC. However, the record in this case reveals competent, substantial evidence relating to the means and manner of Daniels' shooting death and his perceptions of the surrounding circumstances, such that the trial court's finding of HAC is warranted. See McGirth, 48 So. 3d at 777; Swafford, 533 So. 2d at 277.

Martin argues that the twelve gunshots that Daniels sustained were the product of random gunfire and were not the result of his intent to torment Daniels. We disagree. Martin's conduct reflects the utter indifference to Daniels' suffering that supports a finding of this aggravating circumstance. While firing multiple gunshots, Martin walked from one side of the vehicle to the other and shot Daniels "back down in the car" to prevent his escape from the SUV. The crime scene photos, corroborated by the testimony of multiple eyewitnesses, track Martin's trail of gunshots from the driver's side of the SUV around to the passenger side.

Moreover, Daniels was alive and conscious during the attack. Dr. Rao's testimony to this effect is supported by the crime scene photos that reveal Daniels' futile attempt to escape. At the time that the shooting began, Daniels was sitting in the driver's seat of the SUV. However, when his body was discovered, his left leg was caught between the front console and the gear shift, and the rest of his body was slumped in the passenger seat. The bloody passenger window found on the

ground outside of the SUV and the blood stains dripping down the outside of the passenger door also reflect Daniels' desperate attempt to save himself. Further, as he tried to shield himself from the hail of gunshots, Daniels sustained a defensive gunshot wound that broke two bones in his left hand. Dr. Rao testified that these broken bones rendered his hand useless as he tried to escape the SUV.

Martin's conduct and Daniels' perceptions of the surrounding circumstances reflect the utter indifference and cruelty that justify the trial court's finding of HAC. We affirm the trial court's finding of HAC, which is supported by competent substantial evidence.

## CCP

Martin challenges the trial court's finding that the murder of Daniels was cold, calculated, and premeditated. "The CCP aggravator pertains specifically to the state of mind, intent, and motivation of the defendant," Wright v. State, 19 So. 3d 277, 298 (Fla. 2009) (citing Brown v. State, 721 So. 2d 274, 277 (Fla. 1998)), and a finding of CCP is subject to the following four-part test:

> (1) the killing must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification.

Lynch v. State, 841 So. 2d 362, 371 (Fla. 2003). Martin does not challenge the

trial court's conclusion that there was no pretense of moral or legal justification.

However, Martin maintains that the murder was the result of the impulsive actions

of "a man who suffers from intellectual deficiencies in the mentally retarded

range," and that the murder lacked the requisite "reflection, calculation, or

preplanning" that is necessary for a finding of CCP. Because competent,

substantial evidence supports the trial court's finding of this aggravating

circumstance, we affirm.

In its detailed sentencing order, the trial court concluded the following

regarding CCP:

> The evidence presented at trial proved beyond a reasonable doubt the existence of this aggravating circumstance. First, the Defendant's actions were a product of cool and calm reflection, in that no evidence was presented which indicated his actions were prompted by emotional frenzy, panic, or a fit of rage. Second, the Defendant planned to murder Mr. Daniels when he retrieved the .45 caliber pistol from Mr. Batie's car. Third, the Defendant exhibited heightened premeditation. The Defendant could have left Mr. Daniels after firing the first round of shots into the driver's side of the vehicle. Instead, the Defendant tracked Mr. Daniels around the car as he attempted to escape the vehicle, firing once into the windshield, and firing several times into the passenger's side. The Defendant ultimately fired at least thirteen shots, and did not stop firing until he was sure he completed his objective. Finally, the Defendant had no pretense of moral or legal justification for the murder.

> Overall, the totality of the circumstances indicate that the Defendant carried out Mr. Daniels' murder in a cold, calculated, and premeditated manner. The Defendant was told a rumor that Mr. Daniels was the person who caused Mr. Batie to be grazed by a

bullet. The Defendant then armed himself with a .45 caliber pistol with an extended magazine and approached Mr. Daniels. The Defendant's intent was not just to commit a felony, it was to kill. After the Defendant fired six shots into the driver's side of the vehicle, he continued to follow Mr. Daniels around the vehicle as Mr. Daniels tried to escape. The Defendant could have stopped shooting and left Mr. Daniels, but did not. See Lynch, 841 So. 2d at 372-73 (upholding the trial court's finding that the murder was calculated where the defendant had time to reflect between firing the first shot and the final fatal shot). The Defendant was not prompted by frenzy, panic, or rage, and Mr. Daniels did nothing to provoke the Defendant. By all appearances, this murder was carried out as a matter of course. This aggravating circumstance has been given great weight in determining the appropriate sentence to be imposed.

(Footnote omitted).

When evaluating whether a murder was cold, calculated, and premeditated, "the focus . . . is the manner of the killing . . . ." Bell v. State, 699 So. 2d 674, 678 (Fla. 1997) (citing Sweet v. State, 624 So. 2d 1138, 1142 (Fla. 1993)). Contrary to Martin's argument, the totality of the circumstances clearly reflects CCP. See Hudson v. State, 992 So. 2d 96, 116 (Fla. 2008) (citing Wike v. State, 698 So. 2d 817, 823 (Fla. 1997)). After arming himself with the .45 caliber pistol, Martin approached the driver's side of the SUV and began firing at Daniels. Panicked by the gunfire that was targeting him, Daniels desperately tried to escape through the passenger side of the vehicle. Undeterred, Martin walked to the front of the SUV, fired another shot, and proceeded to the passenger side where he finished shooting Daniels.

Although this sequence of events evolved rather quickly, Martin's act of tracking Daniels to prevent Daniels' escape from the SUV contradicts any suggestion that Martin's actions were merely impulsive and lacking reflection and calculation. Quite the contrary, instead of retreating after firing into the driver's side of the SUV, Martin walked several feet to the other side of the SUV to finish what he started. All the while, Daniels desperately tried to escape Martin's hail of gunfire. Martin's deliberately ruthless act demonstrates the heightened premeditation that is necessary to support the trial court's finding of CCP. See Fennie v. State, 648 So. 2d 95, 99 (Fla. 1994) ("[Defendant's] actions, therefore, exude the deliberate ruthlessness necessary to raise his premeditation above that generally required for premeditated first-degree murder."). The trial court's finding of CCP was based on the application of the correct rule of law and was supported by competent substantial evidence. Consequently, we affirm.

Ring Claim

Further, Martin argues that Florida's death penalty scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002), and is therefore unconstitutionally imposed. Martin also invites this Court to reconsider its holdings in Bottoson v. Moore, 833 So. 2d 693 (Fla. 2002), and King v. Moore, 831 So. 2d 143 (Fla. 2002). We conclude that Martin's Ring claim is without merit, and we decline to reconsider Bottoson and King.

This Court has consistently held that where a defendant has been convicted of a prior violent felony, the requirement in <u>Ring</u> is satisfied. <u>See</u> <u>Merck</u>, 975 So. 2d at 1067 ("This Court has held that the requirement that the jury make all of the findings necessary to enhance a defendant's sentence is satisfied where one of the aggravators is the prior violent felony aggravator."). In December 2001, Martin pled guilty to second-degree murder with a deadly weapon. Thus, <u>Ring</u> is satisfied. <u>See</u> <u>id.</u>

Moreover, this Court has rejected similar challenges to the constitutionality of Florida's death penalty statute and invitations to reconsider <u>Bottoson</u> and <u>King</u>. <u>See</u> <u>Peterson v. State</u>, 94 So. 3d 514, 538 (Fla.) ("We have consistently rejected claims that Florida's death penalty statute is unconstitutional. Peterson has not presented any argument that requires us to reconsider this precedent.") (citations omitted), <u>cert. denied</u>, 133 S. Ct. 793 (2012). Therefore, Martin is not entitled to relief.

Sufficiency of the Evidence

As we are bound to do in every death case, we evaluate the sufficiency of the evidence on which the State relied to convict Martin. Although Martin does not challenge the sufficiency of the evidence on which the State relied to obtain its conviction, this Court must independently evaluate each death case for sufficiency of the evidence relied upon to convict the defendant. <u>See</u> <u>Caylor v. State</u>,

78 So. 3d 482, 500 (Fla. 2011). "In conducting this review, we view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Rodgers v. State, 948 So. 2d 655, 674 (Fla. 2006) (citing Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)). In this case, there is sufficient evidence to sustain Martin's conviction.

The record reveals the following. At Martin's request, Batie took Martin to the Weber 5B Apartments. While at the apartment complex, Batie mentioned to Martin the possibility that the person in the SUV was the person who shot him (Batie) two days earlier. Martin took Batie's gun, approached the SUV, and began shooting Daniels. Batie was not the only eyewitness to the murder who implicated Martin; multiple eyewitnesses also identified Martin as the shooter. In sum, six witnesses who identified Martin as the shooter testified at trial. Moreover, Martin attempted to convince eyewitness Hart to remain silent about what she witnessed.

The consistent testimony of multiple eyewitnesses placed Martin at the scene of the crime and identified him as the sole person who shot Daniels. Moreover, Martin made statements after the fact that expressed consciousness of guilt. Thus, there is sufficient evidence to affirm Martin's conviction for first-degree murder.

## Proportionality of Martin's Death Sentence

"Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review." Hurst v. State, 819 So. 2d 689, 700 (Fla. 2002). This Court's proportionality review involves "a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence." Offord v. State, 959 So. 2d 187, 191 (Fla. 2007) (quoting Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003)). "This entails 'a qualitative review . . . of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.' " Id. (quoting Urbin v. State, 714 So. 2d 411, 417 (Fla. 1998)). Thus, in determining whether a death sentence is proportional, this Court does not simply compare the number of aggravating circumstances versus the number of mitigating circumstances. See id. We conclude that Martin's death sentence is proportional to similar cases where the sentence of death has been imposed.

The trial court found three aggravating circumstances in this case: prior violent felony, HAC, and CCP. Each of these aggravating circumstances is among the weightiest in Florida's death penalty scheme. This Court has repeatedly identified HAC and CCP as "two of the most serious aggravators set out in the statutory sentencing scheme." Larkins v. State, 739 So. 2d 90, 95 (Fla. 1999).

"Similarly, the prior violent felony aggravator is considered one of the weightiest aggravators." Silvia v. State, 60 So. 3d 959, 974 (Fla. 2011) (citing Sireci v. Moore, 825 So. 2d 882, 887 (Fla. 2002)). In this case, the prior violent felony aggravating circumstance is based on Martin's conviction of a non-contemporaneous second-degree murder. What is more, Martin had not been released from prison for that murder for a full five months when he murdered Daniels.

We note that although codefendant Batie received a sentence of imprisonment for second-degree murder, Batie's sentence does not render Martin's death sentence disproportionate. "This Court has repeatedly stated that, when the defendant is the shooter, the death penalty is not disproportionate even though a codefendant received a lesser sentence." Armstrong v. State, 642 So. 2d 730, 739-40 (Fla. 1994). See also Mordenti v. State, 630 So. 2d 1080 (Fla. 1994).

This Court has upheld death sentences with comparable findings of aggravating and mitigating factors. For example, in Lynch, we affirmed the defendant's death sentences where the trial court found three aggravating circumstances as to each murder. Similar to the present case, in Lynch, the trial court's finding of one statutory mitigating circumstance and multiple nonstatutory mitigating circumstances did not render either death sentence disproportionate. Lynch, 841 So. 2d at 377.

We have also affirmed death sentences with less aggravation than the present case. For example, in Heath v. State, 648 So. 2d 660 (Fla. 1994), the trial court found two aggravating circumstances: "Heath was previously convicted of second-degree murder; and the murder was committed during the course of an armed robbery." Id. at 663 (footnote omitted). In addition to two nonstatutory mitigating circumstances, the trial court also found one statutory mitigating circumstance, that Heath was under the influence of extreme mental or emotional disturbance. Id. Similar to the present case, Heath also involved a codefendant that received a sentence of imprisonment. Id. This Court upheld Heath's death sentence, and it also expressly rejected Heath's challenge to the disparity between his death sentence and his codefendant's sentence of imprisonment. Id. See also Hayes v. State, 581 So. 2d 121, 123-24 (Fla. 1991) (upholding the death penalty where the trial court found two aggravating circumstances, one statutory mitigating circumstance, and nonstatutory mitigating circumstances including that the defendant "is of low intelligence" and "developmentally learning disabled"). Although the trial court in Martin's case found the existence of more nonstatutory mitigating circumstances than the trial court in Heath, we conclude that Martin's sentence is nonetheless proportional to Heath in light of the relatively slight weight given to Martin's mitigation.

- 26 -

Moreover, we have affirmed death sentences in cases where, unlike Martin's case, the sole aggravating circumstance was a prior violent felony conviction for second-degree murder. See Ferrell v. State, 680 So. 2d 390 (Fla. 1996); Duncan v. State, 619 So. 2d 279 (Fla. 1993). In this case, not only did the trial court find the existence of Martin's prior violent felony conviction for second-degree murder, the court properly found the existence of HAC and CCP. Thus, the especially weighty aggravating circumstances and the relatively slight mitigating circumstances render Martin's death sentence proportional to other cases where this Court has upheld a sentence of death.

## CONCLUSION

Therefore, having considered all of Martin's claims, and having satisfied our obligation to determine the sufficiency of the evidence and the proportionality of Martin's death sentence, we affirm Martin's conviction and his sentence of death.

It is so ordered.

LEWIS, QUINCE, CANADY, and POLSTON, JJ., concur.
LABARGA, C.J., concurs in part and dissents in part with an opinion in which PARIENTE and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

LABARGA, C.J., concurring in part and dissenting in part.

Although I concur with the majority in affirming Martin's conviction and his sentence of death, I write in dissent to the majority's conclusion that the trial court properly found CCP as an aggravating circumstance. As the majority opinion correctly states, the following four factors must exist in order to find CCP:

> (1) the killing must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification.

Lynch v. State, 841 So. 2d 362, 371 (Fla. 2003). Contrary to the majority view, I do not believe that Martin's conduct exhibited the heightened premeditation that CCP requires. With respect to a trial court's finding of heightened premeditation, this Court has stated:

> Simple premeditation of the type necessary to support a conviction for first-degree murder is not sufficient to sustain a finding that a killing was committed in a cold, calculated, and premeditated manner. A heightened form of premeditation is required which can be demonstrated by the manner of the killing. To achieve this heightened level of premeditation, the evidence must indicate that a defendant's actions were accomplished in a calculated manner, i.e., by a careful plan or a prearranged design to kill.

Besaraba v. State, 656 So. 2d 441, 444 (Fla. 1995) (quoting Holton v. State, 573 So. 2d 284, 292 (Fla. 1990)).

- 28 -

The evidence in this case is inconsistent with a finding that Martin had "a careful plan or a prearranged design to kill." Besaraba, 656 So. 2d at 444 (quoting Holton, 573 So. 2d at 292). Instead of a murder that was carried out as a result of a plan or prearranged design, Daniels' death was spontaneously triggered by Batie's observation that Daniels may have been the person who shot him days before. Martin took Batie's gun, approached Daniels, and began shooting. Thus, the evidence reveals a murder that was abruptly committed while "using [a] hastily obtained weapon[ ] of opportunity." Mahn v. State, 714 So. 2d 391, 398 (Fla. 1998).

In light of the trial court's finding of two particularly weighty aggravating circumstances, HAC and prior violent felony, I conclude that the finding of CCP was harmless error. Nonetheless, as to this Court's conclusion that the trial court properly found CCP, I dissent.

PARIENTE and PERRY, JJ., concur.

An Appeal from the Circuit Court in and for Duval County,
   Linda Firouzabadian McCallum, Judge –
   Case No. 162009CF014374AXXXMA

Nancy Ann Daniels, Public Defender, and William Carl McLain, Assistant Public Defender, Tallahassee, Florida,

   for Appellant

Pamela Jo Bondi, Attorney General, and Charmaine Millsaps, Assistant Attorney General, Second Judicial Circuit, Tallahassee, Florida,

for Appellee