# Supreme Court of Florida

_____

No. SC18-214
_____

**ARTHUR JAMES MARTIN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC18-1696
_____

**ARTHUR JAMES MARTIN,**
Petitioner,

vs.

**MARK S. INCH, etc.,**
Respondent.

January 16, 2020

PER CURIAM.

Arthur James Martin appeals an order of the circuit court denying in part his third amended motion to vacate his conviction of first-degree murder and sentence of death filed pursuant to Florida Rule of Criminal Procedure 3.851. He further

petitions this Court for a writ of habeas corpus. We have jurisdiction. *See* art. V,

§ 3(b)(1), (9), Fla. Const.[1] For the reasons expressed below, we affirm the order of

the postconviction court and deny the habeas petition.

## FACTS AND BACKGROUND INFORMATION

Martin was convicted of the 2009 first-degree murder of Javon Daniels.

*Martin v. State*, 151 So. 3d 1184, 1187 (Fla. 2014). The jury recommended the

death penalty by a vote of nine to three. *Id.* at 1189. The trial court followed that

recommendation and sentenced Martin to death. *Id.* at 1190. In the opinion on

direct appeal, the Court detailed the facts surrounding the crime:

> Two days before the murder, Martin's friend and codefendant
> Franklin Batie (Batie) was involved in a shooting where he was
> grazed on the back of the head and neck. On October 28, 2009, the
> day of the murder, Batie drove Martin to the Weber 5B Apartments in
> Jacksonville so that Martin could visit someone. Batie drove his car, a
> white Ford, to the apartment complex, and he remained in the car
> while Martin got out of the car and engaged in conversation. In the
> back seat of the Ford was Batie's loaded .45 caliber handgun. The
> gun was equipped with a thirty-round magazine.
> While Batie remained in the car and waited for Martin, he
> noticed a white [Toyota] sport utility vehicle (SUV) and thought that
> he recognized the driver of the SUV as the person who shot him days
> earlier. Batie retrieved his gun from the backseat and mentioned to
> Martin that he possibly recognized the driver as having tried to shoot
> him. Martin then took Batie's gun and went to the driver's side of the

---

1. The State questions whether this Court has jurisdiction over Martin's appeal because the postconviction court granted Martin a new penalty phase pursuant to *Hurst v. State*, 202 So. 3d 40 (Fla. 2016). However, we rejected a similar assertion in *Merck v. State*, 260 So. 3d 184, 188 n.1 (Fla. 2018) ("[T]he pending resentencing does not affect our exclusive jurisdiction over this appeal.").

SUV and began firing multiple shots at the driver, nineteen-year-old Daniels. When Daniels tried to escape through the passenger side of the SUV, Martin walked around the front of the SUV to the passenger side and continued firing. Eyewitness Sebastian Lucas testified that upon reaching the passenger side, Martin "shot him [Daniels] back down in the car." When Martin finished shooting, he walked back to the Ford, and Batie drove Martin home. Daniels died at the scene. Batie drove home to Starke, Florida, where he disposed of his Ford and began driving another vehicle. The murder weapon was never located.

Following the murder, detectives interviewed multiple eyewitnesses who viewed photospreads of possible suspects and identified Martin as the shooter. Some of the witnesses did not know Martin by his given name but by his nicknames, "Beer Belly" or "Shorty Fat." Martin was arrested several days after the murder, and a grand jury later indicted him for first-degree murder. Three days after Martin's arrest, Batie was arrested in Starke. Batie later entered a guilty plea to second-degree murder. After the conclusion of Martin's trial, Batie was sentenced to ten years' imprisonment for his role in the murder.

. . . Multiple eyewitnesses, including codefendant Batie, testified and identified Martin as the person who shot Daniels. One of the eyewitnesses, Tasheana Hart, testified that in the days following the murder, Martin asked her "not to tell" what she saw on the day of the murder and offered her money in exchange for her silence.

The medical examiner, Dr. Valerie Rao, testified that Daniels sustained a total of twelve gunshot wounds. Daniels was shot in his left hand, left arm, right arm, left side, right side, right thigh, and chest. Four of the gunshot wounds produced fatal injuries to Daniels' lungs, heart, liver, and stomach. . . . The gunshot wounds to each of Daniels' arms broke the humerus in each arm, and the gunshot wound to his left hand broke two of the bones in his hand. These broken bones incapacitated Daniels and left him incapable of completing his attempted escape from the SUV.

*Id.* at 1187-88.

In imposing a sentence of death, the trial court found the existence of three

aggravating factors: (1) the murder was committed in a cold, calculated, and

- 3 -

premeditated manner without any pretense of moral or legal justification (CCP); (2) the murder was especially heinous, atrocious, or cruel (HAC); and (3) prior violent felony (based upon a prior conviction for second-degree murder). *Id.* at 1188, 1190. Each aggravating factor was given great weight. *Id.* at 1190. The trial court found one statutory mitigating circumstance: Martin's age (forty years old at the time of the murder), which was given slight weight "based on minimal evidence of Martin's significant emotional immaturity." *Id.* With respect to the nonstatutory mitigating circumstances proposed by Martin, the trial court found as follows:

> (1) Martin is functionally illiterate (slight weight); (2) Martin has a learning disability (slight weight); (3) Martin has low cognitive functioning (some weight); (4) Martin suffered a lifetime of poor health, including asthma, diabetes, and sleep apnea (slight weight); (5) Martin was a loving and caring son (slight weight); (6) Martin was a hard worker (slight weight); (7) Martin was generous (slight weight); (8) Martin was reverent (slight weight); (9) Martin was a loving and caring brother (slight weight); (10) Martin's love of work was often thwarted by his poor physical health (very slight weight); (11) Martin's childhood was plagued by the excessive alcohol consumption and fighting of his parents (some weight); (12) Martin was respectful to the judge and other officers of the court (very slight weight); (13) sentencing Martin to death is disproportionate and disparate given Batie's sentence to life imprisonment (rejected as not proven); and (14) the jury recommendation was not unanimous (proven, but no weight assigned).

*Id.* at 1190 n.4. The trial court also found and gave slight weight to two nonstatutory mitigating circumstances that were not proposed by Martin:

(1) Martin had "temper issues"; and (2) when Martin was a child, he was attacked by other children. *Id.* at 1190 n.5.

On direct appeal, Martin raised four issues: (1) whether the trial court made improper findings of fact and gave insufficient consideration in mitigation to Martin's intellectual functioning; (2) whether the trial court failed to consider, find, and weigh as a mitigating circumstance that Martin had a history of drug and alcohol abuse; (3) whether the trial court erred in finding the CCP and HAC aggravating factors; and (4) whether Florida's death penalty sentencing scheme was unconstitutional under *Ring v. Arizona*, 536 U.S. 584 (2002). 151 So. 3d at 1190. We rejected each claim, concluded there was sufficient evidence to sustain the conviction, and determined the death sentence was proportionate. *Id.* at 1190-99. Accordingly, we affirmed Martin's conviction and sentence. *Id.* at 1199.[2]

Martin filed his initial rule 3.851 motion for postconviction relief on February 18, 2016, but it was stricken. His first amended motion was also stricken. On March 31, 2016, Martin filed his second amended motion for postconviction relief, raising nine claims: (1) Martin is intellectually disabled and, therefore, his execution would violate the United States and Florida Constitutions;

---

2. We noted the sentencing order contained a factual error regarding which doctor administered to Martin the Wechsler Adult Intelligence Scale, Revised Edition, but concluded the error was harmless. *Id.* at 1191.

(2) trial counsel was ineffective during jury selection by (a) failing to conduct a meaningful death qualification of the jury, (b) failing to educate the jury on the penalty-phase process, (c) failing to inquire about racial bias, and (d) diminishing the jury's role in sentencing in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985), and failing to object to comments that minimized the role of the jury; (3) trial counsel was ineffective during the guilt phase by failing to (a) conduct an adequate investigation, (b) adequately argue pretrial motions in limine, (c) effectively cross-examine guilt-phase witnesses, (d) present the testimony of two eyewitnesses, (e) litigate and challenge the photographic identifications, (f) hire a forensic consultant or ballistics expert, and (g) adequately challenge the evidence during closing statements and present a viable defense; (4) prosecutorial misconduct during the guilt phase; (5) trial counsel was ineffective during the penalty phase by failing to (a) conduct an adequate mitigation investigation, (b) adequately prepare the defense expert who evaluated Martin for intellectual disability, and (c) challenge aggravating factors and present mitigating circumstances; (6) Martin was denied his right to a qualified mental health expert pursuant to *Ake v. Oklahoma*, 470 U.S. 68 (1985); (7) cumulative error; (8) Florida's lethal injection protocol is cruel and unusual punishment; and (9) Martin's death sentence violates *Hurst v. Florida*, 136 S. Ct. 616 (2016), and *Caldwell*.

The postconviction court scheduled an evidentiary hearing on claims (1), (2)(b), (3)(a), (3)(c)-(g), (5)(a), 5(b), and all but one subpart of (5)(c)—the failure to challenge the prior violent felony aggravating factor.  Thereafter, the court allowed Martin to file a third amended motion for postconviction relief to add a tenth claim alleging *Brady* and *Giglio* violations.[3]  During a status conference, the court noted that Martin is entitled to a new penalty phase pursuant to *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016).  As a result, the evidentiary hearing addressed only guilt-phase claims.

Martin presented as witnesses trial counsel Francis Shea (who primarily handled the guilt phase) and Christopher Anderson (who primarily handled the penalty phase); Anderson's office manager, Deirdre Berger Anderson; Liza Catron, Bruce Robinson, Kenneth Moncrief, and Fred Hillerich, who were appointed as investigators for the defense at different times prior to trial; trial witness Tasheana

---

3. *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).  In the same order, the postconviction court disallowed Martin from amending claims (1), (3), and (5), but allowed him to present additional witnesses with respect to those claims.

Hart;[4] Tasheana's mother, Pamela Hart;[5] Corey Davis,[6] who lived at the apartment complex where the murder occurred; and Christopher Robinson, who provided expert testimony with respect to forensics. The State presented Robert Nelson, who previously worked for the Jacksonville Sheriff's Office; current Jacksonville Sheriff's Office detectives Mitchell Chizik and Stephanie Strawn; and then-assistant state attorneys Richard Mantei and Richard Komando. On January 8, 2018, the postconviction court issued an order that granted the *Hurst* claim, denied the guilt-phase claims, and declined to consider the claims related to the penalty phase.

This appeal follows. Martin has also filed a petition for writ of habeas corpus.

## MOTION FOR POSTCONVICTION RELIEF

The majority of the claims presented in Martin's appeal allege ineffective assistance of trial counsel. To demonstrate entitlement to relief on such a claim, a defendant must meet the following requirements:

---

4. In the postconviction record, Tasheana's name is also spelled Tasheanna and Tashianna. To maintain consistency with our opinion on direct appeal, the spelling Tasheana will be used.

5. Because mother and daughter have the same surname, they will be referred to by their first names.

6. Davis's first name is spelled both Corey and Cory in the postconviction record.

First, counsel's performance must be shown to be deficient. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Deficient performance in this context means that counsel's performance fell below the standard guaranteed by the Sixth Amendment. *Id.* When examining counsel's performance, an objective standard of reasonableness applies, *id.* at 688, 104 S. Ct. 2052, and great deference is given to counsel's performance. *Id.* at 689, 104 S. Ct. 2052. The defendant bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955)). This Court has made clear that "[s]trategic decisions do not constitute ineffective assistance of counsel." *See Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000). There is a strong presumption that trial counsel's performance was not ineffective. *See Strickland*, 466 U.S. at 669, 104 S. Ct. 2052.

Second, the deficient performance must have prejudiced the defendant, ultimately depriving the defendant of a fair trial with a reliable result. *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052. A defendant must do more than speculate that an error affected the outcome. *Id.* at 693, 104 S. Ct. 2052. Prejudice is met only if there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. 2052. Both deficient performance and prejudice must be shown. *Id.* Because both prongs of the *Strickland* test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo.

*Bradley v. State*, 33 So. 3d 664, 671-72 (Fla. 2010). Because *Strickland* requires a

defendant to establish both prongs, if one prong is not met, "the court is not

required to analyze whether the defendant has established the other prong."

*Frances v. State*, 143 So. 3d 340, 347 (Fla. 2014).

*Communication*

In his first claim, Martin contends that trial counsel Shea was ineffective because Shea maintained only sparse communication with him. Martin notes that on at least two occasions, he complained to the trial court that Shea was not meeting with him. Martin also presented Shea's billing records, submitted to the Justice Administrative Commission (JAC), which indicated he only visited Martin seven times for a total of less than nine hours from the date of appointment until trial.

During the evidentiary hearing, Shea testified that the billing records he submitted to the JAC were not an accurate reflection of all the time he spent on Martin's case. He explained:

> Although I keep an accurate time of the official documents we file with the Court there are many times that we meet or I meet with a client either at the courthouse or in a private session that was set aside up at the old courthouse. At the old courthouse the bailiffs would provide us with a jury room during the trial—pretrial proceedings where we could sit down and confidentially talk with our client and I would do that almost every occasion that I was there on a pretrial, and I just didn't bill for that because I would have my time in court and so I didn't bill for those meetings specifically.
>
> There are other times when I would be at the Duval County Jail on other cases and instead of spending an hour with a client [as] I anticipated might only take 20 minutes and while I was there I would go over and see Mr. Martin or another client.

Although Shea did not bill for every moment he worked on Martin's case, he verified that the billing he did submit was accurate with respect to the work he

performed in reference to that billing. Shea testified that he and penalty-phase counsel Anderson met with Martin and thoroughly discussed the evidence and the content of the law enforcement reports to determine the strategy in the case. In Shea's words, "I wanted [Martin] to understand what we're faced with and then give me any feedback as to what his response would be."

Martin has failed to demonstrate either prong of *Strickland*. The postconviction record reflects that Shea met with Martin and thoroughly discussed the case with him and the strength of the evidence against him. Further, Shea testified his JAC billing records are often not an accurate reflection of how frequently he meets with clients. Therefore, Martin has failed to meet his burden of demonstrating that Shea was deficient in his communication with Martin. Further, even if there had been any deficiency, we have explained that brevity of consultation alone is not grounds for postconviction relief. *Kilgore v. State*, 55 So. 3d 487, 501 (Fla. 2010). To be entitled to relief, actual prejudice must be shown. *Id*. Although Martin may have expressed frustration with the frequency of visits by Shea, he has failed to demonstrate a reasonable probability that had Shea met with him more often, the result of the guilt phase would have been different and, thus, confidence in the outcome has not been undermined.

Accordingly, Martin is not entitled to relief on this claim.

*Use of Court-Appointed Investigators*

Martin next alleges that Shea was ineffective for failing to use the investigators who were appointed to work on Martin's case. We disagree. During the evidentiary hearing, Shea testified that he did not use the investigators for the guilt phase because he concluded he could conduct the investigation himself:

> I don't need an investigator if I'm doing the things myself unless there's something specifically that I want the investigator to do . . . . [T]he J.A.C. doesn't want me just to hire an investigator to go out and ride around the streets looking for stuff. He's got to have an issue and—in order to get paid and that's a requirement of the J.A.C. and a proper requirement.
>     . . . .
>     . . . I knew that the investigator was going to be used at this point to develop our mitigation based on all the facts that we had about the case.
>     . . . .
> I had enough information to do the investigation *and the one critical question which came really on that was from my conversation with [Martin]*.

(Emphasis added.) Over objection and on cross-examination, Shea described the following interaction with Martin:[7]

> When I told [Martin] that—that Batie had put the gun down on the passenger seat and he reached in and grabbed it his response—his response was I didn't do that. [Martin] said [Batie] handed me the gun, and then we talked about running around the vehicle. He didn't make any admissions there but then I said, also, that witnesses are

---

7. We have explained that "[a] defendant may not invoke the attorney-client privilege to preclude trial counsel from testifying about their conversations when those discussions relate to the defendant's claims of ineffective assistance." *Arbelaez v. State*, 775 So. 2d 909, 917 (Fla. 2000).

saying that you . . . shot through the—the window, the passenger window, and he indicated that he didn't shoot through the passenger window.[8]

So I was working with those facts in—in going forward with my defenses, and I was working against all these eyewitnesses identifying him from his weight, height and so forth and now the issue was was he the person out there, and after my discussions with him I had no other choice but to know that he was the person out there, so it changed my strategy in trying to put this claim off on some other person of a similar weight and height because there was no indication or evidence that anybody else other than him was out there.

Based upon the information Shea had, we conclude it was a reasonable strategic decision to focus investigator efforts on collecting mitigation evidence for a potential penalty phase while Shea conducted the guilt-phase portion of the investigation. *See Occhicone*, 768 So. 2d at 1048 ("Counsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions.").

Based upon the foregoing, this claim is denied.

*Investigation of Eyewitnesses*

During the evidentiary hearing, Shea explained that one element of his defense was misidentification. Martin contends Shea was ineffective for failing to investigate two eyewitnesses who would have supported the misidentification defense by testifying that Martin was not the shooter. The first witness was Willie

---

8. Penalty-phase counsel Anderson testified he was present during this discussion.

McGowan, who rode to the apartment complex with Daniels, but was outside of the vehicle when the shooting began. The other witness was Larry Jones, who was riding a bicycle in the area at the time of the shooting. Both men are now deceased. As we explain below, Martin has failed to demonstrate ineffectiveness with respect to either witness.

Willie McGowan

According to a police report, McGowan and Daniels traveled to the apartment complex to purchase marijuana. When they arrived, McGowan asked a "short fat dude"[9] if he had any marijuana. The individual told McGowan marijuana was available and pointed him toward a certain apartment. McGowan exited the vehicle to purchase the marijuana. According to the police report:

> McGowan said as he approached the apartment, he heard several gunshots. He said [he] ran across the courtyard towards the Toyota where the victim was sitting. McGowan said he saw the short, fat black male shooting into the driver's side of the vehicle with a "machine" type pistol. He said he watched as the victim crawled over into the front passenger's seat and kick[ed] out the passenger window in an attempt to escape the gunfire. McGowan told us that as the victim was trying to get out of the Toyota through the passenger window, the suspect walked around the front of the vehicle and continued to fire rounds at the victim. He said he watched the suspect shoot into the passenger side until the victim did not move any more.
> McGowan said as the shooting was happening, the driver of the Ford[] Crown Victoria pulled it in front of the Toyota and waited for the shooter. [McGowan] said as he ran towards the Toyota to help the

_____

9. At the time of Martin's arrest, he was 5'3" and the circumference of his waist was forty-eight inches.

victim, the driver yelled out to the shooter to "watch his back." McGowan said the shooter then fired a round at him and he ducked behind the rear of the Toyota. McGowan said he then watched as the shooter calmly walked up the sidewalk (east bound) on W. 22nd Street. He said the shooter walked passed [sic] the Ford[] Crown Victoria and the driver called him back to get in the car.

. . . .

McGowan described the shooter to us as a black male, who was "really short." He estimated that the shooter was approximately 5'0" to 5'3" tall. McGowan said the shooter was "fat" with a very "big stomach." He said he was wearing a white tank top with brown (khaki) shorts and he had dark skin. He further told us that he "looked right into his (shooter's) eyes" and that he would be able to identify him.

During a meeting with law enforcement, McGowan was presented with two photospreads. McGowan said of Martin's photographs, "this looks like the guy, but it's not him." Despite McGowan's statement that Martin was not the shooter, Shea never spoke with him. Instead, Shea's investigation with respect to McGowan consisted of reviewing the statements to police and the outcome of the photographic identification.

We conclude Shea was deficient for failing to investigate McGowan further. When a witness to a homicide states that he looked the suspect in the eye and could identify him again, and then fails to identify the defendant from photospreads, any reasonable trial counsel whose defense strategy is based upon misidentification would at least speak to that witness, even if counsel ultimately decides not to call him for strategic reasons. Shea's decision not to speak to McGowan may have been based in part upon the conversation Shea had with Martin in which Martin

- 15 -

admitted he was the shooter, but because misidentification was part of the defense theme, Shea should have at least inquired into McGowan's failure to identify Martin as the shooter.

Even though Shea was deficient in this respect, Martin nonetheless is not entitled to relief because he has not demonstrated prejudice. To demonstrate prejudice in this context, Martin would first have to show that Shea's personal contact with McGowan would have uncovered additional information that could have influenced Shea's strategic decision not to call McGowan as a witness. Martin did not present any evidence suggesting that McGowan's trial testimony would have differed from his statements to police, and the trial court correctly concluded that Shea's decision to avoid calling McGowan as a witness constituted reasonable trial strategy given the information known to Shea.

First, McGowan's statements to the police were consistent with how other witnesses described the shooter and the execution style of the shooting. Second, according to McGowan's statement to police, the shooter told him where in the apartment complex he could buy marijuana. Shea testified during the evidentiary hearing that he believed it would be detrimental to Martin's defense if the jury were to hear that this case involved illegal drugs, or that Martin used illegal drugs heavily. Further, McGowan provided another highly unfavorable detail to the police—the shooter fired at him as he was running towards the vehicle to help

Daniels. Given these facts, Shea concluded that having McGowan testify "would never have benefitted [Martin]." For these reasons, we hold there is no reasonable probability that, but for Shea's failure to further investigate McGowan, the outcome of the guilt phase would have been different, and confidence in the outcome has not been undermined.

Larry Jones

In a police report, Jones described the shooter as a "short, fat, black male." However, in a different police report, Jones described the shooter as 5'8" and 160 pounds. In both statements, Jones informed detectives he would not be able to identify the shooter if he saw him again. Prior to his death, Jones signed an affidavit stating he "had a very good look at the shooter[,]" he was only interviewed once by the police, his description of the shooter as 5'8" and 160 pounds was the only description he gave, he had "no idea" where the other description came from, he was "100% certain [Martin] is not the man I saw doing the shooting that day," and defense counsel never contacted him.

Shea testified during the evidentiary hearing that he did speak with Jones, and Jones' description of the shooter matched that of Martin. In denying this claim, the postconviction court credited Shea's testimony: "Shea clearly investigated Jones, and Shea's decision not to call Jones as a witness was reasonable. Jones' original description of the shooter, documented in the police

reports *and confirmed in his phone call with Shea*, matched Defendant's appearance and corroborated testimony of other witnesses." (Emphasis added.) This Court will defer to a postconviction court's findings where they are supported by competent, substantial evidence because that court has a "superior vantage point in assessing the credibility of witnesses and in making findings of fact." *Moore v. State*, 132 So. 3d 718, 727 (Fla. 2013) (quoting *Porter v. State*, 788 So. 2d 917, 923 (Fla. 2001)). Because Shea contacted Jones and learned that what Jones saw was consistent with what was described by the other witnesses, Shea's investigation as to Jones was not deficient.

Based upon the foregoing, Martin is not entitled to relief on this claim.

*Forensic Experts*

Martin next asserts that Shea was ineffective for failing to hire forensic experts to challenge the State's evidence. According to Martin, the State's depiction of Martin tracking Daniels around the vehicle while firing the weapon was used to support the assertion that the murder was premeditated, and also in support of the CCP and HAC aggravators.

During trial, Florida Department of Law Enforcement (FDLE) laboratory analyst Maria Pagan testified that she received thirteen fired shell casings and four fired bullets. Although she was able to determine that the thirteen casings were fired from the same weapon, the results on the four bullets were inconclusive.

However, she testified that the barrels of firearms have grooves cut out "that also twist so that when the bullet travels down the barrel it imparts spin to the bullet which helps it travel." According to Pagan, the four bullets had six grooves with a right twist, and this is consistent with the type of firearm that was in codefendant Batie's vehicle on the day of the murder.

During the evidentiary hearing, defense expert Christopher Robinson testified that, based on his review of the materials in Martin's case, not all bullets recovered from the crime scene were submitted to the FDLE crime laboratory. Robinson found this "incredibly problematic because we need to know were all the bullets from the same weapon . . . . [A]ccording to the findings of the lab[,] they can't even match the four that they already have to each other." According to Robinson, the failure to conclusively match the bullets raised the possibility that there was a second weapon at the scene.

Robinson further explained that more than a single trajectory rod should have been used, given the multiple bullet holes in the vehicle. Had the proper number of rods been used, "you would have been able to triangulate exactly where the shooter was as they were moving across the scene." Robinson testified that based upon his reconstruction, the shooter did not fire directly into the passenger-side door. Instead, based upon the angles, the shooter was "firing along the passenger side from the front edge of the car." Robinson admitted that, even

without trajectory rods, he could see nine bullets were fired into the driver side, one was fired into the front windshield, and three bullets were fired from the front edge of the passenger side. When asked by the State, "[s]o if a witness testified that they saw [the shooter] shooting into the driver's side and move around to the front of the car and then shot into the passenger side,"[10] that would be a matter of phrasing, Robinson agreed.

With respect to blood spatter, Robinson testified that an expert could have performed an analysis "to give the position of the individual in the vehicle that's been shot as they moved across the vehicle to their final resting place." Based upon the directionality of the bullets through Daniels' body, Robinson concluded every one of the bullets that hit Daniels had been fired through the driver-side door. On cross-examination, Robinson agreed with the State's depiction of events that "the victim would have been sitting in the driver's seat. He would have been hit while sitting in the driver's seat and then there are wounds that indicate that he at some point moved from the driver's seat to attempt to get out the passenger side window, passenger side."

---

10. Witness Lauren Burns testified that she first saw Martin shooting into the driver side of the SUV and "then he walked around and went to the passenger side and continued shooting."

Shea testified it would not have been helpful to hire an expert to conduct an analysis as to where the shooter was standing and from where the shots were fired. Shea based his conclusion on "the Medical Examiner's report of the entry of the shots and the witnesses describing where the victim was in the cab of the vehicle and the location of the bullet holes that indicate entry into the cab and so forth." He similarly concluded that trajectory, casings, or blood spatter experts would not have made a difference in Martin's case:

> I've done a lot of cases where trajectory is important, the number of the shooters, the direction of the bullets, the type of bullets being used, the entry locations on the victim and all of that. There's nothing in this case that would benefit me from a trajectory. All it would do is support the state's case of how it happened, what happened and how the victim died.

Shea testified there was "never any indication there was possibly a second shooter out there, nothing. There was nothing that would even—no witness at all could substantiate that."

Martin has failed to demonstrate that Shea was ineffective for failing to hire forensic experts. First, it would not have been helpful to have an expert testify that the shooter did not fire directly into the passenger-side door. The evidence presented during trial—including crime scene photos—reflects that the shooter fired into the SUV from the driver side, then the front, and finally from the front edge of the passenger side. This demonstrates the shooter moved around the car and shot at Daniels from multiple directions.

- 21 -

Second, Martin fails to show how a trajectory or blood spatter analysis would have helped defeat premeditation. Even if all the shots that hit and killed Daniels were fired from the driver side and no shots were fired directly through the passenger-side door, this does not change the fact that the shooter moved around the vehicle. The evidence reflects that during the shooting Daniels was trying to escape the SUV from the passenger side. Arguably, the shooter did not know which, if any, fired shots were fatal and continued to follow Daniels around the car to prevent his escape. Thus, the fact that Daniels was not hit by any bullets fired from the front or the front edge of the SUV would not negate the fact that the shooter followed Daniels around the vehicle intending to shoot him until he stopped moving.

We deny this claim.

*Cross-Examination of Witnesses*

Martin next claims Shea was ineffective for failing to adequately cross-examine several guilt-phase witnesses. We commence the analysis of this claim by noting that Shea's defense strategy was two-fold: (1) present a misidentification defense and (2) eliminate premeditation. With respect to the latter, Shea explained that in capital cases, "you're always thinking of the second part of the case and is this gentleman going to be facing death from the testimony that's given during his trial." He stated:

[O]ne of the issues I was looking at with the jury obviously is—is that [the State] didn't prove the premeditation of this case and hopefully we can get a second[-]degree conviction if—if—if the evidence showed that or even a manslaughter because that's one of the things that I plead to the jury in my closing . . . .

Additionally, as previously discussed, Martin disclosed to Shea that he was the shooter, so this changed Shea's trial strategy "in trying to put this claim off on some other person of a similar weight and height because there was no indication or evidence that anybody else other than him was out there."

Lauren Burns

During trial, eyewitness Lauren Burns testified that she had never seen Martin before the shooting. However, in an earlier statement to police, she stated she knew the shooter as "Shorty Fat" and that he had previously expressed interest in her, but she was not interested in him because he was a cocaine user. Further, Burns testified during trial that she saw the shooter fire into the driver side of the vehicle and then walk around to the passenger side and continue shooting. However, during her deposition, she said she heard a gun cock and then observed the shooter firing at the vehicle from the driver side. At that time, she picked up her children and ran into her apartment. According to the deposition, she did not see the shooter fire into the passenger-side door.

Martin contends Shea should have impeached Burns' trial testimony with her statement that she previously knew Martin. He also asserts her trial testimony

- 23 -

could have been impeached with her statement that she only saw the shooter fire through the driver side and not into the passenger side. According to Martin, while the physical evidence reflects that all of the shots that actually hit Daniels were fired through the driver-side door, Burns' trial testimony painted a more sinister picture of the shooter "tracking" Daniels, which was used to support the CCP and HAC aggravators.

Shea was not ineffective in his cross-examination of Burns. First, Shea had a strategic reason not to bring up her statement to police that she knew Martin prior to the murder but was not interested in him because he was a cocaine user. As previously discussed, Shea wanted to avoid any evidence specifically tying Martin to drug use or reflecting that he used illegal drugs heavily. When asked if he could have voir dired the prospective jurors on this issue, Shea responded, "Why do I want to voir dire? I don't want the jury to know there's a drug transaction involved here so, no, I don't think that's beneficial to the defendant." Moreover, had Shea introduced this prior statement by Burns, it could have had the opposite effect of bolstering her identification of Martin as the shooter, thereby strengthening the State's case.

With regard to the failure to impeach Burns on her deposition testimony that she saw Martin shoot into the driver-side door, but not into the passenger-side door, this statement is not inconsistent with the evidence at trial, nor with the

postconviction testimony of Robinson. Robinson testified that bullets were not fired directly into the passenger-side door but were fired from the front edge of the passenger side of the vehicle. This is consistent with Martin "walk[ing] around and [going] to the passenger side and continu[ing] shooting," as Burns testified. We agree with the postconviction court that "[i]t is logical Burns may not have seen Defendant shoot into the passenger's door but could see Defendant shoot along the passenger's side of the SUV when Defendant walked to the passenger side of the front of the vehicle."

However, even if Shea was deficient for failing to impeach Burns on any purported inconsistencies, Martin cannot demonstrate prejudice. First, Burns picked Martin's photograph out of a photospread and, in the courtroom, she identified Martin as the shooter. Second, Sebastian Lucas, Tasheana Hart, and codefendant Franklin Batie also identified Martin as the shooter. Third, witness testimony and the physical evidence reflected that Martin did not simply stand in one place while he shot Daniels; rather, after firing multiple shots into the driver-side door, Martin moved to the front of the vehicle, fired a bullet into the front windshield near the roof, and then proceeded to the front edge of the passenger side where he continued shooting. Thus, the evidence is consistent with Martin "tracking" Daniels around the vehicle. Accordingly, there is no reasonable probability that but for any deficiency by Shea in his cross-examination of Burns,

the result of the guilt phase would have been different, and confidence in the outcome has not been undermined.

Sebastian Lucas

When first spoken to after the murder, Sebastian Lucas informed an officer that "he heard the shooting, but he did not see anything that would assist with the investigation." However, a number of days later, Lucas approached officers and said he had information:

> Mr. Lucas told Detective Nelson that he was sitting out in front of the apartments prior to the shooting. Mr. Lucas told Detective Nelson that his sister-n-law [sic], Lauren Burns, yelled out, "He's got a gun." Mr. Lucas said he looked up and observed a short, fat guy, with a low haircut holding a handgun.
> Mr. Lucas told Detective Nelson that he lost sight of the suspect because the apartment building blocked his view. Mr. Lucas said he heard some gunshots so he got up to see what was going on. He told Detective Nelson that he observed the victim attempting to get out of the vehicle (white sport utility vehicle) through the passenger's door. Mr. Lucas said he watched the suspect walk around to the passenger's side of the vehicle and "execute" the victim. Mr. Lucas said the suspect appeared to be armed with a "Mac-10 or Mac-11 handgun with an extended clip." Mr. Lucas told Detective Nelson the suspect then walked over and got in a white Ford Crown Victoria that fled the scene.
> Mr. Lucas told Detective Nelson that the day of the shooting was the first time that he had ever seen the suspect. Mr. Lucas further described the suspect as wearing a "tank top type t-shirt and Fila brand tennis shoes."
> Mr. Lucas was shown a photo spread that contained Martin's photograph and he positively identified Martin as the person he saw shooting the victim.

On November 3, 2009, Lucas gave a sworn statement. He described the shooter's facial hair as "patchy" and confirmed that after the shooter began firing, the victim "was trying to get out [of] the passenger's side." He stated the shooter went around the vehicle and continued to fire at the person inside. When asked if there was any question in his mind as to whether the person he picked out of the photospread was the shooter, Lucas replied, "[I]t's vague because, you know, I walked past him, I seen him, and he just—you know you just glimpse—as you walk past somebody, you see them . . . and keep going because you don't know them. Exactly like that." However, Lucas then stated he obtained a sufficient look at the shooter to pick him out of a lineup.

Lucas gave a deposition on March 6, 2012. He stated he was certain the person he picked out of the photospread was the shooter. Lucas stated that, after the shooting, he learned of a nickname (Shorty Fat) for the shooter from another resident of the apartment complex.

During trial, Lucas described the shooter as a heavyset black male with a full beard who was "[m]edium, short" in height. Lucas testified that he saw the shooter "walk from the Ford Crown Vic to the SUV and open fire." According to Lucas, the shooter began firing from the driver side, and "[a]fter he shot through the driver's side the victim tried to escape out the passenger side and he walked around and opened fire and shot him back down in the car." On cross-examination, Lucas

stated he saw the shooter "face on" because Lucas "walked past him twice going to and coming from the store," but he did not see him for long, "probably five, ten seconds." Lucas testified he had not seen the shooter in that area before, and "there's no other heavyset low cut dude in that area." Lucas admitted he learned of the nickname Shorty Fat through "[h]earsay, around the apartment complex."

Martin asserts that Shea was ineffective for failing to impeach Lucas with respect to (1) inconsistencies as to the shooter's facial hair, (2) learning the nickname of the shooter from a secondhand source (which Martin asserts could indicate that Lucas learned details about the murder from sources other than personal observation), and (3) Lucas's initial statement that "he did not see anything that would assist with the investigation." First, Shea was not deficient in his failure to address Lucas's inconsistencies with respect to the shooter's facial hair. Shea testified during the evidentiary hearing that he did not want to call attention to the fact that Martin had shaved his beard after the murder because a change in appearance would suggest consciousness of guilt. This is not an objectively unreasonable strategy. During trial, photographs of Martin taken immediately after his arrest were introduced into evidence, and he did not have a full beard. Impeaching Lucas's trial testimony that the shooter had a full beard with an earlier description of the shooter possessing "patchy" facial hair could

have brought to the jury's attention that Martin had shaved his beard after the murder, and this could have been detrimental to his defense.

Second, the fact that Lucas later learned the shooter was nicknamed Shorty Fat from someone in the apartment complex does not demonstrate he learned about the shooting from someone else or somehow identified the wrong person. Therefore, Shea was not deficient in failing to address this point during cross-examination.

However, Shea was deficient when he failed to cross-examine Lucas with respect to his initial statement to police that he did not possess any information relevant to the investigation. This statement did not include damaging facts or a physical description of the shooter. It simply stated that Lucas heard the shooting but did not see anything that would assist in the investigation. The change in Lucas's version of events is dramatic—from seeing nothing to providing compelling testimony of an execution-style murder. Given the lack of damaging information in Lucas's initial statement, there was no reasonable basis for Shea not to address the inconsistencies between this statement and his trial testimony.

However, despite this deficiency, Martin cannot demonstrate prejudice. Lucas (as well as Burns, Tasheana, and codefendant Batie) identified Martin as the person who shot Daniels. Second, other witnesses and the physical evidence reflected that the shooter moved around the SUV as Daniels tried to escape and

continued to fire at him.  Accordingly, there is no reasonable probability that but for any deficiency by Shea, the result of the guilt phase would have been different, and confidence in the outcome has not been undermined.

Ronnie McCrimager

Witness Ronnie McCrimager provided the following account to law enforcement:

> Mr. McCrimager told Detective Nelson that he was inside his home cooking when he heard what sounded like gunshots.  Mr. McCrimager said that as he looked out of his kitchen window, in the direction of the sound of the gunshots, he observed an unknown black male shooting into a white sport utility vehicle.  Mr. McCrimager told Detective Nelson that he did not see who was sitting in the vehicle. He said that he did observe the shooter walk from the driver's side of the vehicle around to the passenger's side of the vehicle, shooting at the occupant.  Mr. McCrimager told Detective Nelson that he got down on the floor as the shooter began to walk away from the vehicle. Mr. McCrimager described the shooter to Detective Nelson as being a black male, who was approximately 30 to 40 years of age.  He said the shooter was short and stocky with a low afro hairstyle.  Mr. McCrimager told Detective Nelson that he did not know the suspect, but if he saw him again, he might be able to identify him.  Mr. McCrimager described the suspect's firearm to Detective Nelson as possibly being a "Mac 10."

McCrimager was shown a photospread.  According to the police report, he "was unsure of his identification, but the person he saw shooting strongly resembled the photograph of Martin."  McCrimager wrote on the photograph of Martin that he "look[ed] like the guy."

- 30 -

In a March 6, 2012, pretrial deposition, when asked if he personally saw the shooter walking around the truck or if he learned this fact later, McCrimager stated, "I learned that later." According to McCrimager, when the shooting started, "I looked out my window[] when he was to the side shooting, the driver's side. After that, I just ducked down, you know."

During trial, McCrimager testified that he did not see the shooter's face, and "all [he] could see is [the shooter] shooting at the white truck that was parked in front of the house." McCrimager described the shooter as 5'7" or 5'8" "and sort of round-shaped, heavyset." He estimated the shooter's weight at 200-300 pounds. McCrimager explained that he was facing the shooter's back and the shooter was facing the driver-side door. McCrimager testified that he saw the shooter walk around the car.

When presented with the photograph of Martin that he wrote upon, McCrimager said he did not remember the document. McCrimager acknowledged that his handwriting was on the photograph, and recognized his name, but when asked if he wrote anything else on the page, McCrimager responded, "I have a problem. I don't have any glasses and I can't see out [of] one eye so it's really hard for me to see this." When asked if he recalled telling law enforcement that the photograph of Martin looked like the shooter, McCrimager reiterated that he had not seen the shooter's face and "I don't want to accuse no one and make a

mistake." On cross-examination, when asked about the photograph of Martin, McCrimager asserted, "the officer just insisted I know this guy. He continued hassling me about it . . . after I done told him I'm not sure about it."

During the evidentiary hearing, Shea stated McCrimager's testimony proceeded exactly as he had hoped. McCrimager's poor eyesight was mentioned during direct examination, so the jury was aware of it. According to Shea, there was nothing to follow up on other than the fact that McCrimager did not see the shooter's face and that he felt pressured into signing a photograph.

Shea was not ineffective in his cross-examination of McCrimager. As Shea explained, on direct examination McCrimager emphasized that his vision was poor, so there was no need to follow up on this point. Further, Shea elicited that McCrimager did not see the shooter's face and that he felt "hassled" by an officer who allegedly insisted he could identify Martin as the shooter. This cross-examination further called into question McCrimager's identification of Martin beyond his poor vision. As to Shea's failure to cross-examine McCrimager on his deposition testimony that he learned the shooter walked around the car "later," Martin cannot demonstrate prejudice because other trial witnesses testified the shooter walked around the vehicle. Accordingly, there is no reasonable probability that had Shea cross-examined McCrimager on this point, the result of the guilt

phase would have been different, and confidence in the outcome has not been undermined.

Tasheana Hart

Tasheana initially told Detective Nelson that she "was outside when the shooting occurred. She . . . thought she recognized the suspect as someone who used to hang out in the neighborhood. Ms. Hart said she had further information and would speak with Detective Nelson if he came back the next day." During that later interview:

> Ms. Hart told Detective Nelson that she saw the shooting. She said the shooter was visiting Cory Davis and Filette Kirkland [neither of whom testified during trial] at their apartment just prior to the murder. . . . [Tasheana] described the suspect as [a] short, fat, black male with a beard. She told Detective Nelson that she watched the suspect retrieve a gun from the white[] Ford Crown Victoria and shoot the victim. Detective Nelson said Ms. Hart did not recognize the driver of the Ford Crown Victoria, but she said the shooter had been in the apartment complex on previous occasions. [Tasheana] further told Detective Nelson that she saw the shooter at [a store] the morning before the shooting.

Officers reviewed surveillance footage from the store but did not locate anyone who matched the description of the shooter. Tasheana subsequently spoke with detectives again, advising them that she personally knew the shooter because her mother was friends with him, and Tasheana referred to him as "Beer Belly." Tasheana was shown two photospreads and picked a photograph of Martin out of the photospread which depicted him without facial hair.

- 33 -

During a November 3, 2009, sworn statement, Tasheana stated she had known Martin "from like since I was 11 [years old]." She stated that at the time of the shooting "Beer Belly" had a beard, but when she saw him later by the Emmett Reed Community Center in Jacksonville, it was shaved off. She further testified:

> He was like, did you hear what happened. I was like, what you talking about, that shooting over there on 22nd. He was like, yeah, that was me. I was like, you the one that made our street hot . . . . And he was like, yeah.
> . . . .
> I wasn't yelling at him. I was just asking because he was like, that was me. He was bragging about it, so I'm like, hey, you made our street that hot. We ain't never had that many police[] since like 2004, 2003. So he was like real excited.
> And this is something he do, so it ain't nothing for him to just take a life. He's a natural killer.

During this statement, Tasheana did not mention any offers of money in exchange for silence.

At trial, Tasheana testified that she knew Martin for a couple of years prior to the shooting through her family, and that she witnessed Martin shoot Daniels. She further stated that when she saw Martin after the shooting, he offered her money "[n]ot to tell." On cross-examination, Shea began an inquiry as to where Tasheana had met Martin, and the State asked to approach the bench. The State noted that Tasheana "knows he has been in prison for murder. She knows he has done this before. She said it in her deposition, and what I want to make sure is if he keeps pushing her about how long [she has] known [him] and the nature of the

- 34 -

connection she is going to say it and she has been instructed not to." The trial court put Shea on notice that he was "to move away from this area," and Shea did not inquire further.

Martin has failed to demonstrate Shea was ineffective in his cross-examination of Tasheana. First, it was revealed during the evidentiary hearing that, based upon Martin's prison release records, Tasheana could have known Martin for "a couple of years." Accordingly, there was no need to pursue this line of questioning. Second, during trial, Shea suggested on cross-examination that it was Tasheana who asked Martin to pay her to keep silent, and not vice versa, and highlighted that she could not specify an amount that Martin purportedly offered to pay her. Third, any decision by Shea not to cross-examine Tasheana with respect to her 2009 sworn statement would have been consistent with his strategy of keeping out details that would harm the defense. The 2009 statement contained highly damaging information, such as that Martin had bragged about the crime and that Tasheana described him as a "natural killer." Further, even though Tasheana failed to mention an offer of money in that statement, in a 2010 deposition she testified that Martin offered her "a couple of grand[]" to keep silent. Finally, the failure of Shea to question Tasheana on the largely irrelevant point of seeing the shooter the morning before the shooting at a particular store does not demonstrate any deficiency. In sum, there is no reasonable possibility that had Shea cross-

- 35 -

examined Tasheana differently, the result of the guilt phase would have been different, and confidence in the outcome has not been undermined.

Detective Mitchell Chizik

Martin claims that Shea was ineffective for failing to cross-examine Detective Chizik on why the Jacksonville Sheriff's Office failed to check the alibi for a second individual who had been shot at the same time as codefendant Batie while he and Batie were walking to a gas station two days before the murder. Martin also asserts that if Shea was not planning to present Willie McGowan or Larry Jones as defense witnesses, he should have elicited their failure to identify Martin as the shooter through the cross-examination of Chizik.

With respect to cross-examining Chizik on the failure to personally verify the alibi of the second individual who had been shot at the same time as Batie, Shea was not deficient. It was revealed during the evidentiary hearing that this person was 6'3" inches tall and weighed 250 pounds. There was no testimony from any of the witnesses that the shooter matched this description or that there was a second shooter matching this description. Further, prosecutor Richard Mantei had spoken by telephone with this other person and "learned that he was released from hospital prior to the victim's murder and transported to his parents' home in south Florida to recover from his injuries. He was not in Jacksonville at the time of the victim's death and he was not aware of the investigation." Thus,

the other individual had an alibi, and Martin has provided no evidence to suggest this individual was in Jacksonville at the time of the homicide.

With respect to cross-examining Chizik on the failure of Willie McGowan to identify Martin, Shea was also not deficient.  Despite McGowan's inability to identify the shooter from the photospreads, his statements to the police were consistent with how other witnesses described the shooter, as well as the shooting.  Further, cross-examining Chizik about McGowan's failure to identify Martin could have opened the door to unfavorable elements of the police report, including that the shooter instructed McGowan as to where in the apartment complex to buy marijuana and that the shooter fired at McGowan as McGowan was running towards the SUV.  Both would have been more harmful to Martin's case than helpful.

Finally, with respect to the failure to cross-examine Chizik as to the investigation of Larry Jones, Shea was not deficient.  Although Jones described the shooter as 5'8" and 160 pounds, he also described the shooter as a short, heavyset black male.  Thus, his statements were internally inconsistent.  Moreover, Jones informed detectives he would not be able to identify the shooter if he saw him again.  Therefore, showing Jones a photospread would not have been productive.  Instead, as with McGowan, it could have brought in damaging information, in that

what Jones stated confirmed the other witnesses' testimony with respect to the murder.[11]

## Maria Pagan

Martin contends that Shea was ineffective for failing to cross-examine Pagan on various aspects of the investigation, such as why she did not receive all the bullets recovered from the scene, the lack of trajectory analysis performed on the vehicle, and how being provided with all of the recovered bullets would have affected her analysis and the conclusions she reached. However, Shea was not deficient with respect to Pagan. First, Pagan is employed by FDLE, and the bullets and casings were submitted for analysis by the Jacksonville Sheriff's Office. These are two different entities, and if asked why she did not receive all the bullets recovered from the scene, Pagan likely would not have been able to answer the question. Further, asking Pagan how possessing all the bullets would have affected her analysis would have necessitated Pagan engaging in speculation. Similarly, had Shea questioned Pagan with respect to the trajectory analysis, it is unclear that

_____

11. Jones informed police that he observed the shooter fire approximately six shots into the driver-side door of the vehicle with a weapon resembling a TEC-9 pistol, walk around the vehicle to the passenger side, and fire three additional shots, after which the shooter entered the passenger side of the Ford Crown Victoria and fled the scene.

she would have been qualified to offer an opinion on this matter because her testimony was limited to comparison of the shell casings.

In conclusion, we hold that Shea was not ineffective in his cross-examination of these trial witnesses, and we deny relief on this claim.

*Eyewitness Testimony*

Martin next contends that Shea was ineffective for failing to present Willie McGowan and Larry Jones as witnesses because they could have testified that Martin was not the shooter and this would have supported Martin's defense of misidentification. In rejecting this claim, much of our analysis is duplicative to the claim that Shea was ineffective for failing to further investigate Jones and McGowan. As previously discussed, the postconviction court credited Shea's testimony that he spoke to Jones. Jones' description of the shooter both during that telephone call and in one police report matched that of Martin. So, if presented as a witness, Jones would have been another person to testify that a short, heavyset black male was the shooter. Therefore, Shea had a valid strategic reason not to present Jones as a witness.

With respect to McGowan, Shea concluded calling McGowan as a witness "never would have benefitted [Martin]" because it would have revealed the execution-style nature of the murder, and it would have brought in other damaging elements of the crime. Given that part of Shea's trial strategy was to negate

- 39 -

premeditation in hopes of obtaining a conviction for second-degree murder (or manslaughter), his decision not to present McGowan was reasonable.

Accordingly, we deny this claim.

*Photographic Identifications*

Martin next contends that Shea was ineffective for failing to challenge the photographic identifications of Martin, and how the photospreads were conducted.[12] Martin asserts that elements of the Jacksonville Sheriff's Office's protocol for use of photospreads were not followed, such as "[t]he photographs will be shown one at a time, not the six (6)-pack style," and "[t]he victim(s) or witness(es) shall be advised the person suspected of committing the crime may or may not be contained in the photospread." We conclude that Shea either adequately challenged the photospreads or had a strategic reason for not challenging how they were conducted.

First, as previously discussed, Shea challenged the validity of McCrimager's identification and elicited from him that he felt pressured to select Martin's photograph. Shea cannot be deficient for failing to do what he actually did. *Banks v. State*, 219 So. 3d 19, 29 (Fla. 2017). Second, witness Sebastian Lucas testified he was given a stack of photographs to review during the photographic

---

12. The identifications introduced into evidence during trial were those by Lauren Burns, Tasheana Hart, Sebastian Lucas, and Ronnie McCrimager.

- 40 -

identification—they were not laid out side-by-side. Therefore, one of the key complaints by Martin with regard to the photospreads did not apply to Lucas. Further, although witness Lauren Burns testified the detectives "said they had some photos that they wanted me to look at and out of the photos they asked me to identify the person that did the shooting," according to her 2012 deposition, a detective advised her that "if anyone of those looked familiar, pick them out." Therefore, Burns' trial testimony was likely a matter of phrasing, and not indicative that the police instructed her to identify the shooter. Moreover, she specifically identified Martin in the courtroom as the shooter.

Third, Shea did point out inconsistencies with Detective Chizik's testimony. Chizik testified that the procedure for conducting a photospread is to

> print six individual photos. . . . We take those six photographs and shuffle them upside down. We place the photographs onto a table. We instruct the witness that the individual that committed this particular offense may or may not be contained in the photospread. We ask the witness to look at each and every photo and identify anybody they recognize within the photospread.

He testified he had personal knowledge that the photospreads were done this way in Martin's case and that he was present for all four photospreads. However, he later stated he was not present for the identification by Lucas. Further, Shea elicited from Burns and Tasheana that, contrary to Chizik's testimony, the photographs were not presented in a stack, but were laid side-by-side.

- 41 -

Additionally, Tasheana testified that only Detective Nelson was present during her photospread.

With respect to challenging precise details of the way each photospread was conducted, Shea explained during the evidentiary hearing why he did not do so:

> [H]aving worked with juries over the years[,] unless the police procedure is planting evidence, is something of substance[,] if there's so much other evidence before a jury, juries somewhat resent challenging the police work, I mean to put [it] kind of bluntly, I guess.

We have explained that trial counsel is not ineffective for failing to impeach a witness where it "would have been of little value compared with the risk of alienating the jury." *Branch v. State*, 952 So. 2d 470, 479 (Fla. 2006). Shea concluded that based upon his experience, challenging how the photospreads were conducted without alleging actual police misconduct would not have benefitted Martin and could have caused juror resentment. Shea's decision not to challenge the photographic identifications on this basis was not an objectively unreasonable strategy.

This claim of ineffectiveness is denied.

*Closing Statements*

Finally, Martin contends Shea was ineffective during closing statements because he purportedly undermined the defense's own theories; failed to present a viable, cohesive theory to the jury; argued facts outside of the record by stating that the individual who had been shot at the same time and in the same location as

- 42 -

codefendant Batie was not at the scene of the murder; and failed to correct a misattribution by the prosecutor. We reject this claim.

In evaluating a claim of ineffective assistance, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Shea was presented with a challenging case—a murder during daylight hours with multiple eyewitnesses, including a codefendant who testified that the murder weapon belonged to him. Further, Shea had to craft a defense aware of the fact that his client had admitted to being the shooter.

Shea testified that his defense strategy was twofold—attack the witness identifications and negate premeditation. In essence, his trial strategy was first to argue that the State had not established that Martin was the shooter beyond a reasonable doubt. Part of this was addressed by calling into question the police investigation. For example, during closing statements, Shea pointed out that McCrimager felt pressured into picking Martin's picture out of a photospread and then suggested Tasheana similarly could have felt pressured into identifying

Martin in a photospread. He also suggested it was Tasheana who told Martin that, if he paid her money, she would not speak to the police, but Shea also questioned her credibility as to the entire encounter:

> She couldn't even tell us what the words were, that there was a specific conversation, just this general thing that he came to me and—I went to him and he offered me money to go away. What does that mean? What was said? She could never testify . . . of any specific words that Mr. Martin may have used to influence her not to proceed against him . . . .

Shea further noted that according to FDLE laboratory analyst Pagan, the casings were sent to the biological department of the FDLE for DNA analysis, but there was no further information about any testing completed. Shea described the case to the jury as "a large mosaic that's missing big chunks out of the middle of that picture."

If the jury concluded Martin was the shooter, Shea then aimed to persuade the jury the murder was not premeditated to avoid the death penalty. Toward this end, Shea spent a significant part of his closing statement on codefendant Batie. Shea suggested that the shooting was planned by Batie, and that Batie, not Martin, had the motive to kill Daniels. Shea argued the State had failed to prove premeditation by the shooter, and he also discussed the lesser included offenses of second-degree murder and manslaughter. Thus, while Shea's closing statement may not have been as eloquent or as organized as Martin would have preferred, counsel did have a strategy and he argued that strategy in his closing statement.

- 44 -

Martin's attacks on Shea's failure to object to comments by the prosecutor, and on comments by Shea himself, are without merit. To the extent the State during closing statements incorrectly attributed to Lauren Burns the fact that Daniels attempted to escape from the vehicle, another witness—Sebastian Lucas—testified to this. Therefore, objecting to any accidental misattribution would not have had an impact on the guilt phase. Second, it is true that Shea stated, "the state's asking you to find Mr. Martin guilty of premeditated first degree murder and they're asking—going to be asking you to make a recommendation about a sentence to the Court." However, to claim that Shea assumed the jury would or should find Martin guilty of first-degree murder takes this statement out of context. As previously discussed, Shea challenged the premeditation element. He also challenged the witness testimony and identifications. Third, Shea in no way eliminated a possible suspect by mentioning that the individual who was shot at the same time and in the same location as codefendant Batie was not present at the scene of the Daniels murder. As previously discussed, not only did the individual not match the description of the shooter, but it was confirmed he was not in Jacksonville at the time of the murder.

Lastly, it was a challenge to address Batie's damaging testimony because much of it matched the testimony of other witnesses as to how the shooting occurred. However, other parts were of questionable logic. For example, Batie

- 45 -

testified that after the shooting, while Batie was driving Martin home, he and Martin never spoke about what happened. Shea's cautioning of the jury in relying on Batie's testimony was reasonable because "there's a lot of things that we don't know about Mr. Batie as to his involvement in this which he has not shared with us and was reluctant to share after he'd already plead[ed] to second degree murder in this case as to what was really going on out there and why this shooting really occurred."

We reject Martin's claim of ineffectiveness on this basis.

*Cumulative Error*

Because the two deficiencies we identified in the performance of counsel taken together are not sufficient to establish the requisite prejudice, Martin's claim of cumulative error fails.

*Brady/Giglio*

In his final claim on appeal, Martin contends that the State committed *Brady* violations with respect to Tasheana Hart and Corey Davis (who did not testify during trial) and a *Giglio* violation with respect to Tasheana. We have explained the standards applicable to these claims as follows:

> To demonstrate a *Brady* violation, a defendant has the burden to establish (1) that *favorable evidence*, either exculpatory or impeaching, (2) was *willfully* or inadvertently suppressed by the State, and (3) because the evidence was *material*, the defendant was prejudiced. *See Hurst v. State*, 18 So. 3d 975, 988 (Fla. 2009) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed.

2d 286 (1999)). . . . Questions of whether evidence is exculpatory or impeaching and whether the State suppressed evidence are questions of fact, and the trial court's determinations of such questions will not be disturbed if they are supported by competent, substantial evidence. *See Way v. State*, 760 So. 2d 903, 911 (Fla. 2000). To satisfy the materiality prong of *Brady*, a defendant must prove that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Guzman v. State*, 868 So. 2d 498, 506 (Fla. 2003) (quoting United *States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (plurality opinion)). . . .

. . . To demonstrate a *Giglio* violation, a defendant must prove that (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. *See San Martin v. State*, 995 So. 2d 247, 254 (Fla. 2008). If the defendant establishes that a prosecutor has knowingly presented false testimony, the burden then shifts to the State to prove that there is not any reasonable possibility that the false testimony could have affected the judgment of the jury. *See Guzman*, 868 So. 2d at 506 (citing *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)). While materiality is a component of both a *Giglio* and *Brady* claim, the *Giglio* standard of materiality is more defense friendly. *See Guzman*, 868 So. 2d at 507.

*Taylor v. State*, 62 So. 3d 1101, 1114-15 (Fla. 2011).

Tasheana Hart

On August 24, 2016, Tasheana Hart executed an affidavit in which she stated that, contrary to her trial testimony, she did not see who shot Daniels. She stated:

4. . . . I was outside when [Daniels, Willie McGowan, and] Cory were talking with another man who I did not recognize. Then, [Daniels] went into his car. The man I didn't recognize got into his car a couple minutes later. That car then started driving away, and when it was right next to [Daniels'] car, the shooting happened.

- 47 -

5.  I did not see who did the shooting.  It looked like it came from the car that started driving away with the man I did not recognize.

Tasheana contended that Daniels' vehicle was blocking her view of the shooter, but the shooter never walked to the passenger side of the vehicle.

According to the affidavit, Detective Nelson insisted Tasheana saw who shot Daniels and threatened to arrest her if she did not pick Martin out of the photospread.  Tasheana stated that Nelson later told her she "needed to say certain things, like that I saw the shooter a few days after the shooting, and that he offered me money to stay quiet.  This was a lie."  She stated it was Nelson who offered her money if she testified as he wished, and he also offered to erase her juvenile record.  According to Tasheana, she also told the prosecutor, "I didn't see anything but he told me it was too late, and I had to say what I already said."

During the evidentiary hearing, Tasheana testified that she did not know Martin personally, but only "knew of him."  She also testified, consistent with her affidavit, that Nelson threatened her.  She stated Nelson would drive around her neighborhood often, confronting her by "throwing Arthur in my face[,] like[,] here's his pictures.  You better pick him and just making sure that you're still going to get [sic] him."  Tasheana testified that prior to trial she approached someone from the prosecution team and advised she "[r]eally didn't feel too well doing this.  Like I told him most of the things that was said I didn't see or they

didn't occur . . . . I still had to testify so he brushed it over his shoulder obviously." She later expressed her belief that the person who told her she "had to testify anyway" was then-assistant state attorney Richard Mantei. She said that other than Mantei, she did not speak to anyone from the prosecutor's office.

Pamela Hart testified that she had introduced Tasheana to Martin "as a friend" and she knew him "from the neighborhood." She verified that Tasheana came to her at one point saying "something about she would be—if she didn't do something that she will be charged with—with I guess contempt of court or whatever you want to call it because at first she didn't want to testify . . . ." However, Pamela said she couldn't recall exactly what Tasheana said. She also stated that they really did not discuss Martin's case because they were both going through their "own little personal issues."

Detective Nelson denied threatening Tasheana with arrest if she did not identify Martin as the shooter. He denied offering Tasheana money in exchange for her testimony or telling her he would have her misdemeanor charge dropped if she testified. Detective Chizik denied that Tasheana was offered money in exchange for a statement. He testified that when he met with Tasheana at her home, she did not seem frightened, as if she had been threatened. Detective Strawn, who accompanied Nelson and Chizik to Tasheana's home to speak with her, testified that Tasheana was cooperative during the meeting. Strawn further

stated that although the Jacksonville Sheriff's Office has funds for confidential informants, there is a procedure to register a person as a confidential informant. She stated the Jacksonville Sheriff's Office does not have access to a fund where "we just give people money to provide us with information." Strawn testified that because Tasheana was a voluntary witness, there was no need to register her as a confidential informant, and she was "absolutely not" offered money in exchange for providing a statement.

Richard Mantei testified that he was assigned to the Martin case from the beginning. He testified that he never received any indication Tasheana was not being truthful or that she was being forced to testify against her will. He stated he did not have the impression that Tasheana was misleading him in any way. Richard Komando, who served as second chair in the Martin trial, testified that he never spoke to or met with Tasheana.

Martin's *Brady* and *Giglio* challenges with respect to Tasheana fail. The postconviction court rejected Tasheana's testimony as not credible, and we defer to findings of credibility by the factfinder where they are supported by competent substantial evidence. *Moore*, 132 So. 3d at 726. In reaching its conclusion, the postconviction court noted Tasheana was argumentative and uncooperative during her evidentiary hearing testimony, even going so far as to say she did not recall having testified previously before a jury. While being cross-examined, Tasheana

accused the State of "twisting [her] words." The court noted Tasheana's testimony conflicted with that of her own mother, who stated that she introduced Martin to Tasheana and that Martin would "hang out" in their neighborhood. The court concluded the State's witnesses were more credible and persuasive than Tasheana. As a result, there was no evidence to support Martin's claim that Nelson threatened Tasheana into implicating Martin, or that she informed the prosecution prior to trial that her statements were untrue and was instructed she had to testify nonetheless.

Accordingly, Martin has failed to demonstrate that the State willfully or inadvertently suppressed favorable evidence or knowingly presented false testimony with respect to Tasheana.

Corey Davis

On December 15, 2016, Davis executed an affidavit in which he stated that when the police initially spoke to him, he advised he did not see anything because he was inside his apartment when the shooting occurred. Davis contended that Detective Nelson then began harassing his sister, informing her that if Davis did not help solve the murder, Nelson would "charge" him. According to Davis, when he met Nelson later, Nelson began "mentioning 'Shorty Fat' as a suspect." The affidavit provides that during a third meeting, Davis told Nelson that he sold Martin marijuana and saw him drive off prior to the shooting. According to Davis, "Nelson told me I better change this part of the story." Davis stated that "Nelson

continually told me that Arthur was the shooter and asked me if I knew anything about it. I repeatedly told Detective Nelson no, but Nelson continued to pressure, coerce, and harass me into giving him a statement." Martin contends that, had the evidence of Detective Nelson's alleged harassment been disclosed to the defense, Davis could have been called as a defense witness. According to Martin, doing so would have introduced further evidence of the questionable police tactics in this case, thereby causing the jury to doubt the validity of the investigation.

During the evidentiary hearing, Davis testified that he had been convicted of ten felonies, one of which involved a crime of dishonesty. Davis admitted to knowing Martin because they had been in prison together and because Davis had dated Martin's niece. Davis testified that the first time he spoke with Detective Nelson about the murder, he was not asked questions specific to it, just "my name, things like that there for that matter." Davis testified that Nelson later contacted his sister, and "[h]e kept calling her, harassing her and telling—telling her like if she don't get in touch with me that they was going to charge me with the crime or whatever." Davis said he then met with Nelson and told him that on the day of the murder, Martin came to the apartment complex, purchased marijuana, and drove away. According to Davis, during a third meeting with Nelson, "he asked me the same questions over and over again and like I told him I didn't see anything."

Martin has failed to demonstrate a *Brady* violation with respect to Corey

Davis. The postconviction court found "[t]here [was] no evidence to show Nelson

threatened or harassed Davis at any of their meetings." In the three encounters

with Nelson that Davis described, the first encompassed only basic information,

the second reflected Davis recounting what he knew about the day of the murder,

and the third involved Nelson requestioning Davis as to what he saw. Davis's only

testimony with respect to intimidation involved his sister. However, Davis's sister

did not testify during the evidentiary hearing, and what Nelson allegedly said to

her constitutes inadmissible hearsay. Accordingly, as with Tasheana, Martin failed

to demonstrate that favorable evidence was willfully or inadvertently suppressed,

and his *Brady* claim fails.

This claim is denied.

## PETITION FOR WRIT OF HABEAS CORPUS
*Racial Stereotypes*

Martin contends that various comments made by the prosecutor tapped into

racial stereotypes, and this constitutes fundamental error that can be reviewed at

any time. Claims of improper argument should be raised on direct appeal and are

therefore procedurally barred in postconviction proceedings. *Jennings v. State*,

123 So. 3d 1101, 1121-22 (Fla. 2013). This claim was not raised on direct appeal

and therefore is procedurally barred. Moreover, even if it had been raised on direct

appeal, for Martin to obtain relief, the improper argument must rise to the level of

fundamental error where, as here, the comments either were not objected to by trial counsel or were objected to, but on a different basis than that raised on appeal. That being said, where a claim of fundamental error is not raised on direct appeal, it is procedurally barred as well. *See Franqui v. State*, 965 So. 2d 22, 35 (Fla. 2007) (concluding that claim of fundamental error in an initial postconviction motion with respect to prosecutor's remark was procedurally barred because it could have been raised as fundamental error on direct appeal). Because Martin is attempting to raise his claim for the first time in a habeas proceeding, any challenge to the comments or to the assertion that they constitute fundamental error is procedurally barred.

Moreover, even if we were to review the comments for fundamental error, Martin is not entitled to relief. This Court has explained that for error to be fundamental, it

> must "reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." [*Harrell v. State*, 894 So. 2d 935, 941 (Fla. 2005)] (quoting *Brown v. State*, 124 So. 2d 481, 484 (Fla. 1960)). We have also defined it as "error which goes to the foundation of the case." *Ray v. State*, 403 So. 2d 956, 960 (Fla. 1981) (quoting *Sanford v. Rubin*, 237 So. 2d 134, 137 (Fla. 1970)). We have cautioned appellate courts to "exercise their discretion concerning fundamental error 'very guardedly.' " *Id.* "[F]undamental error should be applied only in the rare cases where a jurisdictional error appears or where the interests of justice present a compelling demand for its application." *Id.* "*Specifically, prosecutorial misconduct constitutes fundamental error when, but for the misconduct, the jury could not have reached*

*the verdict it did."*  *Miller v. State*, 782 So. 2d 426, 432 (Fla. 2d DCA 2001).

*Farina v. State*, 937 So. 2d 612, 629 (Fla. 2006) (emphasis added).

In this case, the murder occurred in a public place during daylight hours. Multiple individuals (including Martin's codefendant) identified Martin as the person who shot Daniels by walking around the SUV and repeatedly firing into it as Daniels attempted to escape.  *Martin*, 151 So. 3d at 1188.  Martin also offered Tasheana Hart money to not speak about what she saw on the day of the murder. *Id.*  Based upon the evidence offered during trial, Martin cannot demonstrate that but for the challenged comments, the jury would not have convicted him of premeditated murder.  Moreover, we have reviewed the comments carefully, and most of them do not remotely hint at racial stereotypes.  Further, even those that could be perceived to have a racial connotation also can be interpreted in a noninvidious manner.

Based upon the foregoing, this claim is procedurally barred, and further does not rise to the level of fundamental error.

### *Ineffective Assistance of Appellate Counsel*

Martin claims that counsel on direct appeal was ineffective for failing to challenge numerous comments by the State during closing statements and for using a visual aid.  When considering such claims, the Court evaluates:

> [F]irst, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
>
> *Pope v. Wainwright*, 496 So. 2d 798, 800 (Fla. 1986). It is the defendant's burden to allege a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based. If a legal issue "would in all probability have been found to be without merit" had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective. *Rutherford v. Moore*, 774 So. 2d 637, 643 (Fla. 2000).

*Frances v. State*, 143 So. 3d 340, 357 (Fla. 2014) (citation omitted) (alteration in original).

Here, all but one of the challenged comments were not objected to by defense counsel. With respect to the objected-to comment, counsel asked for a curative instruction, and the trial court gave one, directing the jury to disregard the comment. Thus, trial counsel received the relief he requested, and appellate counsel was not deficient for failing to raise this claim. Because Martin did not object to the remainder of the comments, he must demonstrate that a claim of fundamental error on direct appeal would in all probability have been successful to demonstrate entitlement to habeas relief. *See Conahan v. State*, 118 So. 3d 718, 733 (Fla. 2013) ("[A]ppellate counsel cannot be deemed deficient for failing to

raise meritless issues or issues that were not properly raised in the trial court and are not fundamental error.").

The prosecutor's use of a visual aid which allegedly depicted a cartoon of a man with his head in the sand[13] is clearly a questionable choice in the context of a capital murder trial. However, while unnecessary, its use cannot be said to rise to the level of fundamental error. The State used the visual aid to argue the evidence supported the conclusion that Martin committed the murder, and the jury should not "bury their heads in the sand [and] ignore the evidence."

With respect to the other challenged comments by the prosecutor, we have considered them and agree that some are concerning. For example, the prosecutor stated that Martin turned Daniels into "target practice," and that the presumption of innocence "has now been blown away just like [Martin] did to Javon Daniels." Further, we have held the use of the pronoun "you" may rise to a "golden rule" violation, and the prosecutor in Martin's case used this pronoun in describing Daniels' final moments prior to his death:

> [W]hen you've got two arms that are broken by bullets in multiple places you can't work the door handles. You can't work the locks. You can't manipulate anything because you can't move your arms, so what are you left to do? You're left to shove with all your might your body weight into a window to try to get the heck out of what is becoming a tomb, and that's exactly what that picture shows. It

---

13. Martin concedes this visual aid did not become part of the record on appeal.

shows you how Javon Daniels tried even with two fractured arms, even having taken fire and being bloody tried to get away.

In *Braddy v. State*, 111 So. 3d 810 (Fla. 2012), during guilt-phase closing statements, the prosecutor used the pronoun "you" in describing the experience of the child victim.

> You're five. You'd just seen what he's done to your mother. You're falling out of a moving car, you're five and it's dark. That's terrifying.
> . . . .
> You're five. You jumped out of a moving car. You seen [sic] what he's done to your mother, and you're terrified.

111 So. 3d at 842-43 (alterations in original). We rejected a challenge to this argument, which was not preserved:

> The State was certainly entitled to make comments recounting [the child victim's] last hours alive as supported by the evidence. But the form in which this recounting of the victim's last hours was presented arguably "cross[ed] the line by inviting jurors to place themselves in the position of the victim." *Mosley* [*v. State*], 46 So. 3d [510,] 521 [(Fla. 2009)]. The repeated use of the pronoun "you" suggests such an invitation. Assuming that these comments crossed the line to become an improper golden rule argument, those comments—in light of the totality of evidence presented at Braddy's penalty phase trial— do not constitute fundamental error.

*Id.* at 843 (citations omitted) (second alteration in original). Here, the prosecutor's use of the term "you," in describing how Daniels attempted to escape from the vehicle with two broken arms while Martin tracked him by walking around the vehicle, can be read to invite the jurors to put themselves in Daniels' place. However, as in *Braddy*, even if this comment crossed the line and became an

impermissible Golden Rule argument, it cannot be said that, but for this comment, the jury would not have convicted Martin of premeditated murder.

We conclude that the challenged comments, when considered individually or cumulatively, do not amount to fundamental error. Therefore, had appellate counsel attempted to raise this claim on direct appeal, it would not have been successful. Accordingly, Martin's claim of ineffective assistance of appellate counsel fails.

*Remaining Claims*

The remainder of Martin's habeas claims relate to his initial penalty phase. Because Martin is receiving a new penalty phase, we decline to address these claims.

**CONCLUSION**

Based upon the foregoing, we affirm the order of the postconviction court and deny the petition for writ of habeas corpus.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, and MUÑIZ, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Duval County,
    Linda McCallum, Judge - Case No. 162009CF014374AXXXMA
And an Original Proceeding – Habeas Corpus

Robert S. Friedman, Capital Collateral Regional Counsel, Dawn B. Macready and Elizabeth Spiaggi, Assistant Capital Collateral Regional Counsel, Northern Region, Tallahassee, Florida,

    for Appellant/Petitioner

Ashley Moody, Attorney General, and Lisa A. Hopkins, Assistant Attorney General, Tallahassee, Florida,

    for Appellee/Respondent